

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

MRG/ALK/AMR                     *271 Cadman Plaza East*
F. #2020R00939                   *Brooklyn, New York 11201*

November 8, 2023

By Email and ECF

The Honorable Ramon E. Reyes, Jr.
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                Re:     United States v. Joseph Lanni, et al.
                        Criminal Docket No. 23-443

Dear Judge Reyes:

            The government respectfully submits this letter in support of its request that the Court enter permanent orders of detention against the defendants Joseph Lanni, Diego Tantillo, Robert Brooke, Kyle Johnson, Angelo Gradilone, Vincent Minsquero, Vito Rappa and Francesco Vicari, each of whom is a member or associate of the Gambino organized crime family of La Cosa Nostra ("the Gambino crime family" or the "Enterprise"). As set forth below, these defendants pose a danger to the community and a risk of flight and obstruction of justice and cannot be trusted to abide by the terms of release. Therefore, they should be detained pending trial. As to defendant Salvatore DiLorenzo, the government respectfully submits that he should be released only with strict conditions and only after posting substantial, heavily secured bonds signed by financially responsible sureties with adequate moral suasion over him.[1]

I.      Background

            On November 2, 2023, a grand jury sitting in the Eastern District of New York returned a sixteen-count Indictment variously charging Joseph Lanni, also known as "Joe Brooklyn" and "Mommino," Diego Tantillo, also known as "Danny" and "Daniel," Robert Brooke, Salvatore DiLorenzo, James LaForte, also known as "Jimmy," Angelo Gradilone, also known as "Fifi," Kyle Johnson, also known as "Twin," Vincent Minsquero, also known as "Vinny Slick," Vito Rappa, also known as "Vi," and Francesco Vicari, also known as "Frank" and "Uncle

---

[1]         The defendant James LaForte is currently in pre-trial detention at FDC Philadelphia in connection with charges filed against him in the Eastern District of Pennsylvania, which are described further below. He will appear in this District at a later date.

Ciccio," with the following offenses: racketeering conspiracy, in violation of 18 U.S.C. § 1962(d); multiple counts of Hobbs Act extortion and conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a); wire fraud conspiracy, in violation of 18 U.S.C. § 1349; multiple counts of theft and embezzlement from union employee benefit plans, in violation of 18 U.S.C. § 664; witness retaliation, in violation of 18 U.S.C. § 1513; and unlawful possession of firearms, in violation of 18 U.S.C. § 922(g) (the "Indictment").

The Indictment is the result of a multi-year investigation by this Office, the Federal Bureau of Investigation, the Department of Labor – Office of the Inspector General and the New York City Police Department, among others, into the ongoing criminal activities of the Gambino crime family of La Cosa Nostra—a violent criminal enterprise that engages in conduct involving murder, robbery, extortion, money laundering and obstruction of justice. The evidence supporting the charges includes, among other things, the following: (1) judicially-authorized wiretaps on multiple telephones used by defendants Tantillo and Rappa;[2] (2) evidence seized pursuant to search warrants executed at certain of the defendants' residences and offices; (3) text messages, photographs and other materials recovered from cellular telephones and iCloud accounts belonging to the defendants and their co-conspirators; (4) witness statements; (5) consensual recordings; (6) law enforcement surveillance; (7) bank and other financial records; (8) telephone records; and (9) physical evidence.

In a coordinated operation, following a parallel investigation, Italian law enforcement today arrested six organized crime members and associates who are charged with, among other crimes, narcotics trafficking.

II.     Relevant Offense Conduct[3]

    A.     The Defendants' Membership in, and Association with, the Gambino Crime Family

As alleged in the Indictment, the defendant Joseph Lanni is a captain in the Gambino crime family; Diego Tantillo, Angelo Gradilone and James LaForte are soldiers in the Gambino crime family; Robert Brooke,[4] Salvatore DiLorenzo, Kyle Johnson and Vincent Minsquero are associates of the Gambino crime family; Vito Rappa is a member of the Sicilian

---

[2]     The government hereby provides notice to the defendants pursuant to 18 U.S.C. § 2518(9) of its intent to rely on wiretap and oral interceptions at the detention hearing in this case. In order to preserve the integrity and confidentiality of the government's investigation, notice to the defendants of the interceptions prior to their arrest was not feasible.

[3]     The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or that it will seek to introduce at trial. The government is entitled to proceed by proffer in a detention hearing. United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004); United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).

[4]     Brooke is not charged with racketeering conspiracy.

mafia and an associate of the Gambino crime family; and Francesco Vicari is an associate of the Sicilian mafia and an associate of the Gambino crime family.

The government will prove the defendants' membership in and/or association with the Gambino crime family through wiretap intercepts, consensual recordings, text messages, bank records, witness testimony, surveillance evidence and physical evidence. For example, the investigation has revealed that Tantillo and LaForte were "made"—or formally inducted—into the Gambino crime family on October 17, 2019. Below is a photograph of Tantillo and Gradilone together the day of the induction ceremony.



Earlier that morning, Tantillo and Rappa exchanged the following text messages, using the thinly veiled code of "new job" and "contract" to signify Tantillo's induction into the Gambino crime family:

| RAPPA: | Good morning Dani have a great day so happy for your new job and when you sign the contract even if I'm not there is like I am very proud good luck !! |
|---|---|
| TANTILLO: | Ty Vito I really wish you were there since you were one of the people help me get this contract. I hope we continue getting more work and everything gets even better than before. Ty as always |
| RAPPA: | We will continue have a great day!! |

Rappa, who is a member of the Sicilian mafia but not a "made" Gambino crime family member, was not permitted to be present during the ceremony under the Gambino crime family's rules.

Financial records demonstrate that Tantillo, Gradilone and LaForte "kicked up" to their captain, Lanni. "Kick ups" are portions of any earnings made by lower ranking members and associates of a crime family that are paid up to higher ranking members of the crime family as tribute. For example, records demonstrate that two companies owned or operated by LaForte, namely Complete Business Solutions Group, Inc. ("CBSG," also known as "Par Funding") and Eagle Six Consultants, through a series of transactions, provided more than one and half million dollars in purported "loans" to Lanni-operated companies which were in fact payments from LaForte to Lanni to conceal the underlying source of the funds—proceeds of LaForte's criminal activity—and to promote the criminal activity and enrich the members of the Enterprise (i.e., kick up payments).

In addition, associates of the Enterprise made payments to members of the Enterprise to further their mutual financial interests, in particular in the carting and demolition industries. For example, JAS Holding LLC, an entity operated by DiLorenzo, issued six checks to Tantillo—totaling $300,000—between February 10, 2020 and March 27, 2020. At the time DiLorenzo made those payments, DiLorenzo was the trustee of a particular union benefit fund, and Tantillo was in control of companies that were signatories to the union's collective bargaining agreement.

B.    Carting and Demolition Industry Extortions, Thefts, Embezzlements and Frauds

The investigation has revealed that, since at least 2017, the defendants have profited from extorting individuals in the New York carting and demolition industries, including through actual and threatened violence, stealing and embezzling from union employee benefit plans and conspiring to rig bids for lucrative demolition jobs.

1.    Extortions of John Does 1-4 and Demolition Company 1

The government's investigation has shown that, beginning in approximately 2017 and continuing for years, defendants Tantillo, Johnson, Rappa and Vicari extorted an individual who owns a carting and hauling company in the New York City area (John Doe 1). Tantillo, Johnson and Brooke also variously extorted three individuals (John Does 2–4) who own a demolition company (Demolition Company 1). As explained in more detail below, these extortions involved lighting the steps of John Doe 1's home on fire, attempts to damage John Doe 1's carting trucks, the violent assault—with a hammer—of an employee at Demolition Company 1, and the violent assault of one of the owners of Demolition Company 1 (John Doe 2).

i.    Extortion of John Doe 1

As noted, the government's investigation has shown that, beginning in late 2017, Tantillo began demanding monthly extortion payments from John Doe 1. The collection of those extortionate payments included repeated threats of physical and economic harm from Tantillo, Rappa and Vicari. For example, while John Doe 1 was making a $1,000 payment to Tantillo, Tantillo showed John Doe 1 a metal baseball bat and told John Doe 1 the baseball bat was for him. When law enforcement executed a judicially-authorized search on Tantillo's premises, they recovered a bat from Tantillo's vehicle, which is pictured below.

4



On another occasion, Rappa sent John Doe 1 a photograph of John Doe 1's place of business late at night, conveying that Rappa, or someone acting for him, had been there.

After John Doe 1 attempted to stop making extortionate payments, the defendants took increasingly violent action, and enlisted defendant Kyle Johnson, a close associate of Tantillo and other Gambino crime family members, to assist them in those efforts. For example, the investigation revealed that Johnson's iCloud contained a photograph of John Doe 1's place of business dated March 30, 2020 and a note containing the address, including the suite number, with the instruction, "gotta get past front gates." Then, on September 22, 2020, at approximately 9:40 p.m., someone set fire to the steps of John Doe 1's home, while his wife and children were inside. A still image of surveillance video of the arson is below.



Less than a month later, on or about October 15, 2020, an individual who was sent by defendants Tantillo and Johnson broke into John Doe 1's place of business and attempted to slash the tires to several of John Doe 1's hauling trucks. When those efforts failed, the individual let the air out of the tires. An employee who did not notice the flat tires attempted to drive one of the trucks, at which point the tires came off the truck, damaging the vehicle.

Two weeks later, on October 29, 2020, an employee at Demolition Company 1 ("the Employee"), who often gave business to John Doe 1's hauling company and was a close

business associate of John Doe 1, was violently assaulted with a hammer.  The Employee bled badly and was hospitalized.  As detailed further below, this hammer assault also furthered the purposes of a separate extortion scheme by Tantillo and Johnson to extort Demolition Company 1 and John Does 2–4.

After the arson at John Doe 1's home, the damage to John Doe 1's trucks, and the hammer assault of the Employee, Vicari and Rappa approached John Doe 1's associate and threatened him and John Doe 1 if the associate did not get John Doe 1 to make extortionate payments.  Rappa and Vicari called Tantillo immediately afterwards to summarize the events and reported to Tantillo that the associate "almost started crying."  During another intercepted phone call, Rappa told Tantillo that Vicari "acted like the 'Last of the Samurai,'" during their meeting with the associate.  Rappa described how Vicari picked up a knife and directed John Doe 1's associate to threaten to cut John Doe 1 in half in order to get John Doe 1 to make extortionate payments: "Get this axe and you make him – two."

Shortly after the defendants approached John Doe 1's associate, John Doe 1 resumed making extortionate payments to Tantillo, which were coordinated through Rappa and Vicari.  After John Doe 1 made one such extortionate payment to Vicari, Rappa and Vicari met and took a photo of Vicari toasting a small champagne bottle (below), which Rappa then sent to Tantillo.



ii. Extortions of Demolition Company 1 and John Does 2–4

The investigation has also revealed that Tantillo, Brooke and Johnson engaged in two separate violent extortion schemes of Demolition Company 1 and its owners, John Does 2–4, over purported debts owed to Tantillo and to a company operated by Tantillo and Brooke, Specialized Concrete Cutting Corp. ("Specialized").

With respect to the latter extortion, Tantillo and Brooke demanded $40,000 from the owners of Demolition Company 1, in connection with amounts Tantillo and Brooke alleged Demolition Company 1 owed to Specialized. When the owners of Demolition Company 1 did not pay the $40,000, Brooke violently assaulted one of the owners (John Doe 2) on a street corner in midtown Manhattan, including by punching him in the face repeatedly, bloodying his face and giving him a black eye. A photograph of John Doe 2, bruised and bleeding after his face had been cleaned by emergency responders, is attached under seal as Exhibit 1.[5]

As noted, Tantillo and Johnson also extorted Demolition Company 1 and John Does 2–4 in connection with money and other financial benefits Tantillo demanded as part of his buyout from Demolition Company 1 (where he at one time worked and was a part owner). The investigation has revealed that John Does 2–4 fired Tantillo from Demolition Company 1 due to his ties to organized crime in approximately spring or summer 2019. In the ensuing months, Tantillo often called and texted John Does 2–4 about being bought out of the company. At times, Tantillo's communications were aggressive. Then, as noted above, in December 2019, John Doe 2 was violently assaulted in the street. After that assault, John Does 2-4 paid Tantillo $50,000 and $3,950,000 in the form of 20% discounts for the use of a transload facility operated by the owners of Demolition Company 1.

Negotiations over additional amounts Tantillo demanded continued throughout 2020 and became increasingly contentious. Then, on October 29, 2020, the Employee was violently assaulted with a hammer by an individual sent by Tantillo and Johnson. That morning, at approximately 6:30 a.m., an unknown individual came to the Employee's office, knocked on the door, and, when the Employee opened the door, began assaulting the Employee with a hammer. The assailant stopped only when another employee arrived and disrupted the assault. A photograph of the Employee taken at the hospital is attached in a sealed filing as Exhibit 2.

---

[5] The government files this photograph, and the photograph of the Employee referenced below, under seal to protect the privacy interests of John Doe 2 and the Employee. See, e.g., United States v. Longueuil, 567 F. App'x 13, 16 (2d Cir. 2014) (summary order) (discussing the sealing of documents which contain sensitive witness information); United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995) ("The privacy interests of innocent third parties . . . should weigh heavily" when determining whether public access is appropriate.).

Minutes after the assault, Johnson texted Tantillo three thumbs-up emojis followed by "work today," as pictured below.



The investigation further revealed that Johnson had photographs of John Doe 3 and of John Doe 3's house, with a post-it note containing John Doe 3's name and home address, in his iCloud account.  Similarly, Johnson also had the names of John Doe 2 and John Doe 4 and their addresses saved in his iCloud account.

2. Theft and Embezzlement from Employee Benefit Plans

The defendants also committed a series of crimes to steal and embezzle from unions and employee benefit plans.  Specifically, Tantillo, aided by co-conspirators, obtained no-show and low-show jobs for his associates Rappa and Gradilone and attempted to obtain a no-show or low-show job for Johnson.  As to Rappa, defendant Salvatore DiLorenzo provided Rappa with a no-show job at a company owned by DiLorenzo.  Through the no-show jobs, Gradilone and Rappa received health care benefits, paid for by unions, to which they were not entitled, in addition to receiving paychecks for work they did not perform.

Tantillo also embezzled from union employee benefits plans by using laborers from a non-union company, Gane Services, Inc., to perform work for union companies operated by Tantillo, and failing to make contributions for such work as required by collective bargaining agreements.

3. Bid Rigging Conspiracy

The investigation also revealed that Tantillo, DiLorenzo and others conspired to rig bids for lucrative demolition jobs.  Pursuant to the conspiracy, Tantillo, DiLorenzo and their co-conspirators agreed to share information regarding their bids and to adjust their bids so that DiLorenzo's company would win the contract.  DiLorenzo's company would then subcontract portions of the job to the co-conspirators' companies.  The investigation revealed that, in early 2021, Tantillo, DiLorenzo and other co-conspirators agreed to rig their bids for a demolition job at 665 Fifth Avenue in New York City ("the Rolex Building").  For example, during an intercepted phone call, Tantillo informed DiLorenzo, "Tomorrow I got that call with the Rolex Building." DiLorenzo responded, "ok," to which Tantillo stated "that's what I wanted to tell you."  DiLorenzo then told Tantillo "I know we put a number in on it too.  I don't know what the fuck is going on with that.  Did you talk to [Co-Conspirator-1] on that?"  Emails seized pursuant to judicially-authorized search warrants reflect that Co-Conspirator-1, who worked at DiLorenzo's company, later sent Tantillo DiLorenzo's company's bid estimate.

C.   Witness Retaliation

In February 2021, LaForte and Minsquero assaulted a person (John Doe 6), who they believed had previously provided information to law enforcement about members and associates of organized crime, while Lanni sat nearby.  That evening, John Doe 6, his girlfriend, and their friends went to Sei Less, a restaurant near West 38th Street and Broadway in Manhattan.  According to witnesses, while the group was waiting to pay their bill, LaForte and Minsquero approached their table.  LaForte called John Doe 6 a "rat" and hit John Doe 6 in the face with a bottle.  LaForte and Minsquero also flipped John Doe 6's table, sending drinks and shattered glass everywhere.  John Doe 6 suffered a bloody nose from being hit with the bottle by LaForte.

D.   Extortion of John Doe 5

In 2020 and 2021, LaForte extorted John Doe 5, a person who owed money to a third individual (the "Lender"), who was an associate of LaForte.  In approximately November 2020, John Doe 5 borrowed $50,000 from the Lender and failed to pay it back on time.  Within a few weeks of being introduced to the Lender, John Doe 5 was also introduced to LaForte, who asked John Doe 5 to run an illegal poker game for LaForte in exchange for a loan of $250,000 from LaForte.  John Doe 5 agreed to run the poker game and later agreed to run a second poker game for LaForte in exchange for LaForte's promise to cover part of John Doe 5's debt to the Lender.  LaForte also offered to be "partners" in running a craps game with John Doe 5 and included players in the craps game who bet on credit—that is, without having to pay in.  When John Doe 5 asked LaForte after the craps game for John Doe 5's share of the earnings from running the game, LaForte became angry, screaming at John Doe 5 that John Doe 5 could not tell him what to do, and hit John Doe 5 in the face, knocking John Doe 5 backward and giving him a black eye.  LaForte later contacted John Doe 5's father in an effort to force John Doe 5 to pay what LaForte said was John Doe 5's debt.

In text messages exchanged in November 2020, shortly after John Doe 5's loan from the Lender, the Lender wrote that "[t]his other punk [John Doe 5] is playing games," "Might ride up to his house Saturday with one of my guys from down here."  Another party to the conversation responded, "I took him up to c jimmy made it clear" and later added, "Well [sic] get it.  He's scared to death of jimmy".

E.   Uncharged Violent Acts and Threats

On September 1, 2023, Lanni and Minsquero caused a disturbance at Roxy's Bar and Grille, a restaurant in Toms River, New Jersey, and threatened the owner of the restaurant (the "Owner") and the Owner's spouse (the "Spouse").

The Owner and the Spouse were working at the restaurant on September 1, 2023.  The Owner was introduced to Lanni and Minsquero during the afternoon or evening by the bartender who was serving them, and the Owner learned Lanni's name to be Joe.  At approximately 8:15 p.m. that evening, Lanni and Minsquero got into an argument with another patron that led the restaurant's staff to ask them to leave.  While being escorted out of the restaurant, both Lanni and Minsquero became belligerent.  Minsquero damaged a painting and punched a wall, and Lanni told the Owner, in substance, that he would "burn this place down with you in it."  Lanni referred

to himself as a "Gambino" around this time.  A member of the restaurant's staff called the Toms River Police Department, who responded to the restaurant and told Lanni and Minsquero not to return.  Lanni and Minsquero left.

Video footage from a gas station across the street from Roxy's Bar and Grille shows Lanni and Minsquero at the gas station approximately 18 minutes after the above-described incident.  The video shows Lanni—minutes after threatening to burn down the restaurant— purchasing a red gas container, walking to a pump, and trying briefly to fill the container with gas before apparently being dissuaded by Minsquero and a gas station attendant.  The video then shows Minsquero reentering the gas station and returning the gas container (while Lanni attempted to physically prevent him from doing so).  The still images below show Lanni buying the gas container, attempting to fill it, and trying to prevent Minsquero from taking the gas container away from him.







Telephone records show that, after being told to leave, Lanni called Roxy's Bar and Grille approximately 39 times between September 1, 2023 and September 2, 2023. At approximately 9:41 p.m., body-worn camera video from a Toms River police officer shows the Owner on the phone with Lanni and saying, "Stop calling my business," as the officer approached. When the officer took the phone from the Owner and tried to speak with Lanni, Lanni—who had already attempted to intimidate the Owner by identifying himself as a member of an organized crime family—said, "Apologize to me," and repeated, "Beg for my forgiveness. Beg for my forgiveness. Beg for my forgiveness . . . Beg. Beg. Beg for my forgiveness. Beg. Beg. Beg for my forgiveness. Say, 'I'm sorry, Joe.'"

At approximately 12:00 a.m. on September 2, 2023—i.e., approximately four hours after Lanni and Minsquero were asked to leave Roxy's Bar and Grille, approximately three and a half hours after Lanni attempted to buy a gasoline container, and approximately two and a half hours after Lanni demanded that the Owner "beg for [his] forgiveness"—the Owner walked out of Roxy's and into the parking lot, accompanied by the Spouse. The Owner got into the driver's seat of a car while the Spouse stood outside the car talking with the Owner through the open driver's side window. While the Owner and the Spouse were talking, a man got into the front passenger door of the Owner's car, punched the Owner in the head, put a knife to the Owner's neck, and threatened to kill the Owner. The Spouse ran to help the Owner and was punched and knocked to the ground by a second man. Both perpetrators then beat the Spouse while the Spouse was on the ground. The man with the knife slashed the Owner's tires with the knife and pointed the knife at the Spouse before leaving on foot.

F.    James LaForte is Detained on Other Charges

Defendant James LaForte is currently in pre-trial detention at FDC Philadelphia in relation to charges filed against him in the Eastern District of Pennsylvania. There, LaForte has been charged with conspiracy to commit wire fraud and securities fraud in connection with funds that were raised from investors Complete Business Solutions Group, Inc., doing business as Par Funding, and its affiliates, and extortionate collection of credit. The indictment also alleges that Joseph LaForte and James LaForte engaged in obstruction of justice, witness tampering, and retaliation. Specifically, it is alleged that in late February 2023, on the streets of Center City

11

Philadelphia, James LaForte, with the assistance of and in coordination with Joseph LaForte, physically assaulted counsel for the receiver for Par Funding in a lawsuit brought by the U.S. Securities and Exchange Commission in the Southern District of Florida. Moreover, in connection with the same lawsuit, the indictment alleges that Joseph LaForte threatened to cause serious bodily injury to another individual in November 2022. Lastly, it is alleged that James LaForte made threats of violence to multiple parties in early 2023 in an effort to interfere with the SEC lawsuit, a federal grand jury investigation, and an anticipated federal prosecution, as well as to retaliate against these parties.

III.    Summary of the Counts Against Each Defendant

As noted, on November 2, 2023, a grand jury in this District returned the Indictment, which charges the defendants with various crimes stemming from the above-detailed offense conduct. The chart below sets forth the crimes charged against each defendant:

| Defendant | Charges |
|---|---|
| Joseph Lanni | • Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One) |
| Diego Tantillo | • Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One) <br><br>• Hobbs Act Extortion and Conspiracy – John Doe 1, in violation of 18 U.S.C. § 1951(a) (Counts Two and Three) <br><br>• Hobbs Act Extortion and Conspiracy – Demolition Company 1 and John Does 2 through 4 from January 2019 through February 2021, in violation of 18 U.S.C. § 1951(a) (Counts Four and Five) <br><br>• Theft from Employee Benefit Plan – Gradilone No Show Job, in violation of 18 U.S.C. § 664 (Count Six) <br><br>• Hobbs Act extortion and conspiracy – Demolition Company 1 and John Does 2 through 4 from November 2019 through January 2020, in violation of 18 U.S.C. § 1951(a) (Counts Seven and Eight) <br><br>• Embezzlement from Employee Benefit Plans, in violation of 18 U.S.C. § 664 (Count Nine) <br><br>• Wire Fraud Conspiracy, in violation of 18 U.S.C. § 1349 (Count Twelve) |

| Defendant | Charges |
|---|---|
| | • Theft from Employee Benefit Plan – Rappa No Show Job, in violation of 18 U.S.C. § 664 (Count Thirteen)<br><br>• Conspiracy to Commit Theft from Employee Benefit Plan – Johnson No Show Job, in violation of 18 U.S.C. § 371 (Count Fourteen) |
| Robert Brooke | • Hobbs Act extortion and conspiracy – Demolition Company 1 and John Does 2 through 4 from November 2019 through January 2020, in violation of 18 U.S.C. § 1951(a) (Counts Seven and Eight) |
| Salvatore DiLorenzo | • Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One)<br><br>• Wire Fraud Conspiracy, in violation of 18 U.S.C. § 1349 (Count Twelve)<br><br>• Theft from Employee Benefit Plan – Rappa No Show Job, in violation of 18 U.S.C. § 664 (Count Thirteen) |
| Angelo Gradilone | • Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One)<br><br>• Theft from Employee Benefit Plan – Gradilone No Show Job, in violation of 18 U.S.C. § 664 (Count Six) |
| Kyle Johnson | • Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One)<br><br>• Hobbs Act Extortion and Conspiracy – John Doe 1, in violation of 18 U.S.C. § 1951(a) (Counts Two and Three)<br><br>• Hobbs Act Extortion and Conspiracy – Demolition Company 1 and John Does 2 through 4 from January 2019 through February 2021, in violation of 18 U.S.C. § 1951(a) (Counts Four and Five)<br><br>• Conspiracy to Commit Theft from Employee Benefit Plan – Johnson No Show Job, in violation of 18 U.S.C. § 371 (Count Fourteen) |

| Defendant | Charges |
|---|---|
| James LaForte | • Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One)<br><br>• Hobbs Act Extortion and Conspiracy – John Doe 5, in violation of 18 U.S.C. § 1951(a) (Counts Ten and Eleven)<br><br>• Witness Retaliation, in violation of 18 U.S.C. § 1513 (Count Fifteen)<br><br>• Felon in Possession of a Firearm, in violation of 18 U.S.C. § 922(g) (Count Sixteen) |
| Vincent Minsquero | • Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One)<br><br>• Witness Retaliation, in violation of 18 U.S.C. § 1513 (Count Fifteen) |
| Vito Rappa | • Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One)<br><br>• Hobbs Act Extortion and Conspiracy – John Doe 1, in violation of 18 U.S.C. § 1951(a) (Counts Two and Three)<br><br>• Theft from Employee Benefit Plan – Rappa No Show Job, in violation of 18 U.S.C. § 664 (Count Thirteen) |
| Frank Vicari | • Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One)<br><br>• Hobbs Act Extortion and Conspiracy – John Doe 1, in violation of 18 U.S.C. § 1951(a) (Counts Two and Three) |

## IV.   Legal Standard

In deciding whether to release or detain a defendant, a court "must undertake a two-step inquiry." United States v. Friedman, 837 F.2d 48, 49 (2d Cir. 1988).  "It must first determine by a preponderance of the evidence that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1)," which includes a "crime of violence," or that the defendant presents a risk of flight or obstruction of justice" under Section 3142(f)(2).  Id.  "Once this determination has been made, the court turns to whether any condition or combinations of

conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial." Id.

If the court finds that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community," the court "shall order" a defendant detained. 18 U.S.C. § 3142(e)(1). The government bears the burden of persuading the court by a preponderance of the evidence that the defendant is a flight risk or by clear and convincing evidence that the defendant is a danger to the community. United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001).

Whether detention is sought on the basis of flight or dangerousness, the Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, "including whether the offense is a crime of violence . . . or involves a . . . firearm"; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including "whether, at the time of the current offense or arrest, the person was on probation [or] on parole"; and (4) the seriousness of the danger posed by the defendant's release. See 18 U.S.C. § 3142(g). Specifically, in evaluating dangerousness, courts consider not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

V.    Detention is Warranted as to Defendants Lanni, Tantillo, Brooke, Gradilone, Johnson, Minsquero, Rappa and Vicari

As an initial matter, defendants Lanni, Tantillo, Brooke, Gradilone, Johnson, Minsquero, Rappa and Vicari are each eligible for detention under both Section 3142(f)(1) and 3142(f)(2). As to the former, the defendants have all been charged with either extortion or a racketeering conspiracy, one object of which was to commit extortion, or both. As the Second Circuit explained in affirming the detention of a leader in the Gambino crime family:

> [Defendant] has been charged with engaging in a RICO conspiracy, the substantive basis for which was the RICO enterprise termed the Gambino Crime Family, which is alleged in the indictment to be an organization whose purposes include committing extortion. Certainly, it cannot be gainsaid that extortion is a "crime of violence" as that term is defined by the BRA.

United States v. Ciccone, 312 F.3d 535, 542 (2d Cir. 2002); see also United States v. Santora, 225 F. App'x 21, 22 (2d Cir. 2007) (upholding district court's finding for pretrial detention purposes that defendant "had committed a crime of violence, specifically conspiracy to commit extortion" (citing 18 U.S.C. § 3142(e); Ciccone, 312 F.3d at 541)).[6] As to Section 3142(f)(2), as explained further below, each of these defendants poses a risk of flight and obstruction of justice.

---

[6]    The Second Circuit has made clear that United States v. Davis, 139 S. Ct. 2319 (2019) and its progeny have no impact on the definition of "crime of violence" under the Bail

A.    The Nature and Circumstances of the Charged Offenses

The seriousness of the danger posed by the defendants' release should not be underestimated given the nature and circumstances of the charged offenses and their membership in, and association with, the Gambino crime family.

1.    The Seriousness of the Danger Posed by the Defendants

As detailed extensively above, the nature and circumstances of the charged offenses—which include racketeering conspiracy, multiple extortions, violent assaults, witness retaliation and arson—are indisputably serious.  Over the course of years, these defendants have instilled fear throughout the demolition industry and in other circumstances to benefit themselves financially.  Given their demonstrated willingness to use actual and threatened violence against extortion victims and others, there is a substantial risk that, if allowed to remain at liberty, the defendants would attempt to intimidate or harm those believed to be witnesses in the government's case.  See 18 U.S.C. § 3142(f)(2); United States v. Madoff, 586 F. Supp. 2d 240, 247 (S.D.N.Y. 2009) (preponderance of the evidence standard applies to determination of both risk of flight and risk of obstruction of justice).

Indeed, with respect to organized crime defendants, courts have observed that such defendants pose a particular threat to the community due to the continuing nature of these criminal organizations.  At bottom, because organized crime defendants are often career criminals who belong to an illegal enterprise, they pose a distinct threat to commit additional crimes if released on bail.  See United States v. Salerno, 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (finding that the illegal businesses of organized crime require constant attention and protection, and recognizing a strong incentive on the part of its leadership to continue business as usual).

Pretrial detention is particularly warranted when defendants, charged with violent crimes, are leaders or high-ranking members of a criminal organization whose activities routinely include violence and threats of violence.  See Ciccone, 312 F.3d at 543; United States v. Colombo, 777 F.2d 96, 99-100 (2d Cir. 1985); United States v. Bellomo, 944 F. Supp. 1160, 1166 (S.D.N.Y. 1996).  Courts in this Circuit have recognized that when organized crime depends on a pattern of violent conduct of the sort charged in this case, the risk to the community is substantial and justifies detention.  For example, in Defede, Lucchese crime family member Joseph Defede was charged with extortion and extortion conspiracy.  The district court ordered Defede's pretrial detention, finding that the government had shown by clear and convincing evidence that Defede was the acting boss of the Lucchese family, thus rendering him a danger to public safety: "The acting boss of the Luchese family supervises all of its far-flung criminal activities, including acts of violence.

---

Reform Act.  See, e.g., United States v. Watkins, 940 F.3d 152, 167 (2d Cir. 2019) (explaining that the Bail Reform Act "does not define criminal offenses, fix penalties, or implicate the dual concerns [of fair notice and preventing arbitrary enforcement] underlying the void-for-vagueness doctrine, it is not amenable to a due process challenge and is therefore not unconstitutionally vague"); see also United States v. Bush, No. 18-CR-00907-PAC, 2021 WL 371782, at *2 (S.D.N.Y. Feb. 3, 2021), appeal dismissed sub nom. United States v. Johnson, No. 21-199, 2021 WL 1811527 (2d Cir. May 4, 2021).

Defede's continued liberty therefore presents a substantial danger to the public . . . ." Defede, 7 F. Supp. 2d at 395.

Moreover, a court in this District denied bail to the acting boss of the Genovese family who "participated at the highest levels in directing an organization alleged in the indictment to be committed to acts of violence to perpetuate its activities and insulate itself from detection by law enforcement," United States v. Cirillo, Cr. No. 05-212 (SLT), slip op. at 7 (E.D.N.Y. 2005), as well as a former acting boss who "is at the highest levels of the Genovese family, participating in highly secret induction ceremonies and sit-downs, and representing the family in important meetings," id. at 11. The Second Circuit affirmed those findings by summary order. See 149 F. App'x at 43 (2d Cir. 2005) ("This court has affirmed the detention of the leaders of organized crime enterprises on the ground that their continued liberty presents a risk to the public not only from their own violent activities but from those of subordinates whom they supervise." (citing Ciccone, 312 F.3d at 543)).

To be sure, decisions to deny bail to organized crime leaders have not been based solely on the defendants' mere "association" with organized crime, but rather on the evidence that members of organized crime, and in particular, high-ranking members of organized crime, routinely engage in acts of violence as a result of their position in a criminal enterprise. Nor is the above caselaw narrowly limited to organized crime "bosses" or "acting bosses." In Salerno, 631 F. Supp. at 1374-75, the court held that a defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise. Likewise, in Colombo, 777 F.2d at 99-100, a captain of a crew in the Colombo family was ordered detained because the operation of that organization posed a risk to the public and a danger to the community by its "consistent pattern of orchestrating a series of violent criminal operations."

Accordingly, courts in this Circuit have routinely detained organized crime defendants charged with racketeering-related offenses. See, e.g., United States v. Giallanzo, et al., No. 17-CR-155 (DLI) (E.D.N.Y. 2007) (Bonanno family acting captain Ronald Giallanzo, soldiers Michael Palmaccio, Michael Padavona and Nicholas Festa and associates Christopher Boothby, Evan Greenberg, Michael Hintze and Robert Tanico all detained as dangers to the community); Cirillo, slip op. (E.D.N.Y. 2005) (Genovese family acting bosses Dominick Cirillo and Lawrence Dentico, as well as Genovese family captain Anthony Antico, detained as dangers to the community), aff'd, 149 Fed. Appx. 40 (2d Cir. 2005); United States v. Gotti, 219 F. Supp. 2d 296, 299-300 (E.D.N.Y. 2002) (Gambino family acting boss Peter Gotti detained as danger to the community), aff'd, United States v. Ciccone, 312 F.3d 535, 543 (2d Cir. 2002); United States v. Agnello, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2000) (Gambino family captain Carmine Agnello detained as danger to the community); United States v. Defede, 7 F. Supp. 2d 390, 395-96 (S.D.N.Y. 1998) (Lucchese family acting boss Joseph Defede detained as danger to the community); United States v. Salerno , 631 F. Supp. 1364, 1375 (S.D.N.Y. 1986) (Genovese acting boss and captain detained as danger to the community), order vacated, 794 F.2d 64 (2d Cir.), order reinstated, 829 F.2d 345 (2d Cir. 1987).

2.   Risk of Flight

The defendants each also pose a serious risk of flight.  The charged offenses carry significant penalties that give the defendants a strong incentive to flee.  Racketeering conspiracy alone carries a statutory maximum sentence of twenty years' imprisonment.  Each extortion count, and the charged witness retaliation count, also carry potential sentences of twenty years in prison. The defendants variously face maximum sentences between 20 and 180 years' imprisonment. These penalties give the defendants an overwhelming incentive to flee and to obstruct justice.  See, e.g., United States v. Williams, No. 20-CR-293 (WFK), 2020 WL 4719982, at *2 (E.D.N.Y. Aug. 13, 2020) (holding that an estimated Guidelines range of "92 to 115 months' imprisonment" gave defendant "a strong incentive to flee"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (holding that the possibility of a "severe sentence" heightens the risk of flight).

Moreover, as evidence by the financial transactions detailed above (which are only examples) the defendants have significant financial resources and thus the ability to flee.

3.   With the Exception of DiLorenzo, Elaborate Bail Packages Would be Insufficient to Protect the Community

With the exception of DiLorenzo, elaborate bail packages would be insufficient to protect the community.  The Second Circuit repeatedly has rejected "elaborate" bail packages for dangerous defendants, including members of organized crime families shown to be involved in violent criminal activities.  See Ferranti, 66 F.3d at 543-44 (rejecting $1 million bail secured by real property); United States v. Orena, 986 F.2d 628, 630-33 (2d Cir. 1993) (rejecting $3 million bail secured with real property, in-home detention, restricted visitation and telephone calls, and electronic monitoring); Colombo, 777 F.2d at 97, 100 (rejecting, among other conditions of release, $500,000 bail secured by real property); see also United States v. Boustani, 932 F.3d 79 (2d Cir. 2019) (holding that Bail Reform Act does not permit two-tiered bail systems where wealthy defendants are effectively released to self-funded private jails).

The Second Circuit has also viewed home detention and electronic monitoring as insufficient to protect the community against dangerous individuals.  In United States v. Millan, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills.  If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendants] that [they] will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (internal citations and quotation marks omitted).  See also Orena, 986 F.2d at 632 ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology" (internal citation and quotation marks omitted)). Notably, in United States v. Dono, where the prior pretrial detention of defendant Michael Uvino was at issue for assaulting two individuals in September 2007 and using a firearm during the assault, the Second Circuit rejected conditions that included, among others, home detention and

electronic monitoring, and requirement that Uvino's father—a retired police officer—take "personal responsibility" for defendant.  See 275 F. App'x 35, 2008 WL 1813237, at *2-3 (2d Cir. Apr. 23, 2008).

Similarly, courts in this District have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring.  See, e.g., Dono, 2008 WL 1813237, at *2-3 (noting that the idea that "'specified conditions of bail protect the public more than detention is flawed'" (quoting Orena, 986 F.2d at 632)); United States v. Cantarella, No. 02-CR-307 (NGG), 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's proposed bail package"); Agnello, 101 F. Supp. 2d at 116 (Gershon, J.) ("the protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility"); United States v. Masotto, 811 F. Supp. 878, 884 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the public or the community, given the ease with which many of them may be circumvented").

B.    The Defendants' History and Characteristics

The defendants' history and characteristics also weigh in favor of detention.

As a captain in the Gambino crime family, Joseph Lanni poses a particular threat if he were released because he has the ability to direct those who report to him to commit crimes on his behalf.  See Salerno, 631 F. Supp. at 1374-75 (holding that defendant would be a danger to the community if released on bail based on evidence that he was a captain in an organized crime family who managed the enforcement operations of the enterprise).  Moreover, as detailed above, he has demonstrated a willingness to commit violent acts himself.  Additionally, as demonstrated by the financial transactions detailed above (which are provided only as examples), Lanni has significant means and accordingly poses a flight risk.

Diego Tantillo is a longstanding soldier in the Gambino crime family.  His dangerousness is demonstrated by the charged and uncharged conduct in this case, including his years' long extortion of John Doe 1 and his multiple extortions of Demolition Company 1 and John Does 2-4, which, as detailed above, all included violent assaults carried out on Tantillo's behalf.  Additionally, as demonstrated by the financial transactions detailed above (which are provided only as examples), Tantillo has significant means and accordingly poses a flight risk.

Angelo Gradilone is a solider in the Gambino crime family.  In 2003, he was convicted in this District of conspiracy to distribute and possess with intent to distribute cocaine and was sentenced principally to 41 months' imprisonment and three years' supervised release.  In 2008, Gradilone pleaded guilty to violating the conditions of supervised release in that case, and his supervised release term was extended by one year.  See Docket No. 00-CR-1289 (NGG). Gradilone also has a felony conviction for criminal possession of a loaded firearm in the third degree (1996) and a misdemeanor conviction for criminal possession of a weapon in the fourth

degree (1993), both in Kings County Supreme Court.  In light of his membership in the Gambino crime family, his history of weapons possession, and his prior unwillingness to conform his behavior to the requirements of supervised release while at liberty, Gradilone is both a danger to the community and a flight risk.

Kyle Johnson is a longstanding associate of the Gambino crime family who repeatedly assisted Tantillo in extorting John Doe 1, Demolition Company 1 and John Does 2-4, including by finding individuals to damage John Doe 1's trucks and to assault the Employee with a hammer.  Moreover, on or about February 23, 2021, Johnson was arrested and charged in the Southern District of New York with being a felon in possession of a firearm.  Johnson pleaded guilty and was sentenced to 30 months' imprisonment.  Johnson is currently on supervised release, which includes a special condition that he not "communicate or interact with" anyone he knows to be engaged in criminal activity.  Nevertheless, toll records reflect that Johnson was in contact with Tantillo after his release in violation of that condition.  Johnson also indicated to his probation officer that he was working at "JNR Construction," located at 2880 Jerome Avenue, Bronx, New York.  2880 Jerome Avenue, Bronx, New York is not linked to JNR Construction, but it does appear to be a job site, i.e, a construction site in the Bronx.  JNR is operated by an associate of the Gambino crime family.  Joseph Lanni has also purported to work for JNR-affiliated entities.  In public records, there is an address for JNR, which is the same address as one listed on a business card for Lanni.

Vincent Minsquero is an associate of the Gambino crime family.  While Minsquero has no known criminal convictions, toll records and video footage show that he has been in contact with Lanni, among other individuals affiliated with organized crime, as recently as September 2023.  Minsquero is charged with witness retaliation for his role in the assault at Sei Less on February 17, 2021, in which he and LaForte attacked a person who they believed had provided law enforcement with information about organized crime members.  Given Minsquero's willingness to violently retaliate against a former witness, there is reason to believe that if released under any conditions, he will attempt to influence potential witnesses against him in the current case, including by using force.

Vito Rappa is a member of the Sicilian Mafia and an associate of the Gambino crime family.  Toll records show that Rappa has been in contact with Lanni as recently as July 2023.  Rappa participated in the extortion of John Doe 1 by sending John Doe 1 a photograph of John Doe 1's place of business late at night and by threatening John Doe 1's associate, among other steps Rappa took to further that extortion.  As described above, in 2019 Rappa exchanged celebratory text messages with Tantillo upon Tantillo's induction as a member of the Gambino crime family, and after John Doe 1 made an extortionate payment to Vicari, Rappa sent another celebratory message to Tantillo.  In 2007, Rappa was convicted in this District of bribery of a federal official, in violation of 18 U.S.C. § 201, and was sentenced to three years of probation and a $10,000 fine.  See Docket No. 07-CR-56 (RJD), ECF No. 285.  In that case, Rappa participated in a scheme to effect the release from custody of his co-defendant.  Rappa and three other individuals affiliated with organized crime conspired and attempted to bribe an individual they believed to be a corrupt law enforcement contact in United States Immigration and Customs Enforcement.  The purpose of the scheme was to unlawfully effect his co-defendant's release from immigration detention.  In light of Rappa's offense conduct in this case, and his prior attempt to

corruptly influence a government official to illegally secure a person's release, no combination of conditions and no bond can reasonably assure his compliance with this Court's instructions.

Francesco Vicari is an associate of the Gambino crime family and an associate of the Sicilian Mafia, and he has extensive ties to other people affiliated with organized crime, including some of his co-defendants. While Vicari has no known criminal convictions, his conduct in this case—threatening a person with a knife to get that person's associate to make extortion payments—demonstrates the significant danger he poses to the community if released.

Robert Brooke is an associate of the Gambino crime family who, as detailed above, violently assaulted John Doe 2 in furtherance of an extortion. In 1994, following a jury trial, Brooke was convicted in the Southern District of New York of Hobbs Act robbery, transportation of stolen property, and possessing a firearm during and in relation to a crime of violence. He was sentenced principally to 14 years' imprisonment. See S.D.N.Y. Docket No. 93-CR-595 (LAP). Brooke committed an act of severe violence in furtherance of an extortionate scheme—the beating an owner of Demolition Company 1. In light of his prior robbery conviction and the more recent act of violence with which he is now charged, he poses too great a threat to the safety of the community to be released.

Salvatore DiLorenzo is an associate of the Gambino crime family. While he has no known criminal convictions, the investigation has revealed that he had communications with Tantillo and Rappa, among other organized crime figures, and that he participated in the no-show jobs scheme described above, including by obtaining a no-show job for Rappa. Additionally, as demonstrated by the financial transactions detailed above (which are provided only as examples), DiLorenzo has significant means and accordingly poses a flight risk. DiLorenzo should not be released unless and until he posts a substantial secured bond, signed by financially responsible sureties with adequate moral suasion over him.

C.    Evidence of the Defendants' Guilt

As discussed above, the evidence of the defendants' guilt is exceedingly strong. The government intends to prove the defendants' guilt at trial through, among other things, consensual recordings; intercepts of telephone calls obtained pursuant to court-authorized wiretaps; testimony of multiple witnesses; and physical and documentary evidence.

VI.    Conclusion

For the foregoing reasons, the government respectfully requests that the Court enter permanent orders of detention as to defendants Joseph Lanni, Diego Tantillo, Robert Brooke, Kyle Johnson, Angelo Gradilone, Vincent Minsquero, Vito Rappa and Francesco Vicari. The government further submits that the defendant Salvatore DiLorenzo should not be released unless and until he posts a substantial secured bond, signed by financially responsible sureties with

adequate moral suasion over him.  Further, any such release should be under strict conditions of supervision.

Respectfully submitted,

BREON PEACE
United States Attorney

By:          /s/           
          Matthew R. Galeotti
          Anna L. Karamigios
          Andrew M. Roddin
          Assistant U.S. Attorneys

cc:     Defense Counsel (by email and ECF)
        Clerk of Court (by ECF)

# EXHIBIT 1
## (Filed Under Seal)

# EXHIBIT 2
## (Filed Under Seal)