1

1        UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF NEW YORK
2
- - - - - - - - - - - - - - - - - X
3
UNITED STATES OF AMERICA,        : 23-cr-443-FB
4                                :
                                 :
5                                :
        -against-               : United States Courthouse
6                                : Brooklyn, New York
                                 :
7                                :
                                 : January 11, 2024
8   KYLE JOHNSON,                :
                                 :
9           Defendant.           :
                                 :
10  - - - - - - - - - - - - - - - - - X

11        TRANSCRIPT OF CRIMINAL CAUSE FOR BOND REVIEW
             BEFORE THE HONORABLE FREDERIC BLOCK
12        UNITED STATES SENIOR DISTRICT COURT JUDGE

13              A P P E A R A N C E S:

14  For the Government:     BREON S. PEACE, ESQ.
                            United States Attorney
15                          Eastern District of New York
                            271 Cadman Plaza East
16                          Brooklyn, New York 11201
                        BY: ANDREW M. RODDIN, ESQ.
17                          ANNA KARAMIGIOS, ESQ.
                            Assistant United States Attorneys
18
    For the Defendant:     THE LAW OFFICE OF PAULA J. NOTARI
19                          125 Park Avenue
                            8th Floor
20                          New York, New York 10017
                        BY: PAULA J. NOTARI, ESQ.
21

22  Court Reporter:  Nicole J. Sesta, RPR, RMR, CRR
                     Official Court Reporter
23                   E-mail:  NSestaRMR@gmail.com

24  Proceedings recorded by computerized stenography.  Transcript
    produced by Computer-aided Transcription.

25

*Nicole Sesta, RPR, RMR, CRR*
*Official Court Reporter*

*Proceedings*                                                                2

1          THE COURTROOM DEPUTY:  Criminal cause for a bail

2     application, United States of America versus Kyle Johnson.

3          I ask counsel if you could state your appearances.

4          MR. RODDIN:  Appearing for the United States,

5     Assistant United States Attorneys Andrew Roddin and Anna

6     Karamigios.

7          Good afternoon.

8          THE COURT:  Welcome to court.  And we have Ms. Lopez

9     from pretrial services.

10         PRETRIAL OFFICER LOPEZ:  Correct, Your Honor.

11         THE COURT:  Go ahead.

12         MS. NOTARI:  Good afternoon, Your Honor.

13         Paula Notari on behalf of Mr. Kyle Johnson.

14         THE COURT:  We're waiting for the defendant to be

15    produced.  We can chit chat in the meantime.  Mr. Roddin, once

16    in a while it's good to smile in this troubled word of ours

17    and make a joke.  I'm sure you do the same thing when I'm not

18    around.

19         MR. RODDIN:  Understood, Judge.

20         THE COURT:  You have a good sense of humor?

21         MR. RODDIN:  Sure.

22         THE COURT:  You're not kidding me, are you?

23         MR. RODDIN:  It's a very serious proceeding, Judge,

24    and I'm not in a position to make jokes.

25         THE COURT:  It is very serious and I'm not

1   suggesting we treat it lightly.  We want to be practical.

2   From my understanding, everybody else is on bail except this

3   defendant; is that correct?

4            MR. RODDIN:  The only other exception would be Mr.

5   LaForte, who is incarcerated on his other EDPA case, in

6   addition to this one.

7            THE COURT:  That's a separate dynamic.

8            MR. RODDIN:  Yes.

9            THE COURT:  He's coming into court now, I believe.

10           (Defendant present.)

11           THE COURTROOM DEPUTY:  Mr. Johnson is now in court.

12           THE COURT:  Okay.  So I made some comments before

13  Mr. Johnson was here, and I'm troubled by the fact that he's

14  the only one who remains in jail.

15           Is there a way to cut that down?  The sun is shining

16  in my eyes and I cannot see.

17           THE COURTROOM DEPUTY:  Yes.

18           (Pause.)

19           THE COURT:  So I mentioned before Mr. Johnson came

20  to court that I was concerned that he is the only one,

21  effectively, who is still incarcerated, and we went over this

22  the last time very carefully.

23           And I kept him in jail because I was not satisfied

24  that he had sufficient assurances from people who I could rely

25  upon to sort of assure that he would be present when needed.

*Proceedings*                                                             4

1      I was also troubled by the fact that his brother was

2   not here, as well.  We have a record all about that.  Mr.

3   Roddin, I take this very, very seriously.  I did not let him

4   out last time because I didn't have a confidence level.

5      But since then, there were submissions made by

6   counsel and I've received a batch of other papers, which I

7   haven't had a chance to look at.  We can talk it through.

8      Let me speak, first, to Ms. Notari.  The sureties

9   are not present today?

10      MS. NOTARI:  No, Your Honor.

11      There were four proposed suretors and in court is

12   Mr. Stanley Johnson.

13      THE COURT:  His brother is here.

14      MS. NOTARI:  He was not present last time.

15      THE COURT:  Well, he gave priority to the fact that

16   his employment came first.

17      MS. NOTARI:  It was a required class that he had to

18   take.  It was a required class that he had to take.

19      THE COURT:  You have to speak a little louder.

20      MS. NOTARI:  Yes.  It was a required class he had to

21   take.  Kenya Tucker is also here.  And, Your Honor, Giselle

22   Malave, and there's information in the packet, she owns two

23   restaurants.

24      THE COURT:  She's not here.

25      MS. NOTARI:  She has 104 temperature.

 1          THE COURT:  Go slow.  What makes this different

 2   is -- how do you pronounce that?

 3          MS. NOTARI:  Giselle, like the model.

 4          THE COURT:  This makes it a little different than

 5   when we were here the last time, and I'm looking at the papers

 6   you submitted here from her.  I haven't had a chance to read

 7   them because you just gave them to me a little while ago, but

 8   she's not here.  She's going to have to sign some papers in

 9   order for Mr. Johnson to be released.

10          MS. NOTARI:  Your Honor, if you have any questions,

11   she's available on standby on the phone.  She's just sick.

12   She has the flu.

13          THE COURT:  I understand that.  We're here for the

14   government.  They're going to probably oppose everything.

15          How do we release him today if I don't have her here

16   to sign the necessary papers?

17          MS. NOTARI:  Could Your Honor have her -- I'll ask

18   that she come to the courthouse tomorrow.

19          THE COURT:  She'll have to do that.  I'm going to

20   rely upon Ms. Lopez to make sure he'll stay in jail until

21   that's done.

22          MS. NOTARI:  I understand that.

23          THE COURT:  I don't know what else I can do.

24          MS. NOTARI:  That's fine, Your Honor.

25          THE COURT:  We'll speak to the folks who are here

*Proceedings*                                                                6

1   today, first, and in the meantime I want to give Mr. Roddin

2   the opportunity to state his position.  So you understand I'm

3   trying to be circumspect.

4           I'm trying to make a reasonable decision to assure

5   that his presence will be here.  He's not going to be going

6   anyplace.  He's going to be on home confinement.  He's going

7   to be possibly detained.  He's not going to have a passport.

8   I don't see any real danger here of his running loose on the

9   community.

10          We're going make sure that the suretors understand

11  what their responsibilities are, and we're going to keep him

12  in until Giselle recovers from her illness and is able to come

13  here and sign the necessary paperwork.

14          You know, he's not a wealthy person.  The other

15  people who are on bail have probably better economic means to

16  really put more of a surety.  Right?

17          So it's a difficult cup of tea because you don't

18  want to punish somebody to a fault if you could avoid doing

19  that, because he may not have financial wherewithal that the

20  codefendants have.  So I just want to share with you how I

21  assess these things.

22          So I'm going to ask you now as representative of the

23  government, what is the fair thing here to do under all the

24  circumstances?

25          MR. RODDIN:  As the Court suggested, we do oppose

1  the package that's being put forth.  And I think there are

2  some circumstances, that as we commented on at the last

3  appearance, set Mr. Johnson apart from some of the other

4  defendants who have been released.  One is a recent gun

5  conviction.

6          I should note, I certainly am aware that the Court

7  said shortly before we called the case that you were inclined

8  to grant the motion.  I just want to make sure that I have

9  given every reason --

10         THE COURT:  I want you to make your record.  We're

11  here to have an open discussion.  That is how I do it.

12         I just want to know whether you share any of my

13  frustrations based on his status compared to the other

14  codefendants.  That's the balance, which I'm concerned about.

15         Sometimes it doesn't matter.  You have to keep

16  somebody in jail if they can't give the Court assurances that

17  they're not going to be a risk.  I get that.  But I don't

18  think that I see a serious risk here under the current

19  circumstances that we're talking about.

20         MR. RODDIN:  One of the factors that I think sets

21  Mr. Johnson apart is the recent felon in possession conviction

22  in the Southern District, as opposed to the much more dated

23  gun involvement by --

24         THE COURT:  You're right.  He's not going to be at

25  liberty.

1          MR. RODDIN:  Another factor would be certainly

2     the direct -- excuse me, not the direct involvement in the

3     sense of swinging the hammer, but the involvement in the

4     hammer assault and the violent extortion attempts.

5          THE COURT:  That's the evidentiary aspect of this,

6     which I understand and weigh.  I don't see that as a risk.

7     He's not going to get out of that house.  I'm not going to let

8     him -- well, you know, will I let him out to go to work?  I

9     don't know.  Maybe not.

10         MR. RODDIN:  When we talk about the conditions on

11    which he's going to be released, I do think the Court should

12    consider that this is, in most material respects, a nearly

13    identical package to what the Court rejected about a month

14    ago.

15         The previous application it was $150,000 bond and

16    then $200,000 bond.  There were three suretors proposed at

17    that time, two of which were the same as the suretors being

18    proposed now.

19         THE COURT:  I think we have Giselle now.  I don't

20    think we had her before.

21         MR. RODDIN:  Correct.  She's the new suretor.

22         THE COURT:  That's the difference here.

23         MR. RODDIN:  And Ms. Malave, of course, is not

24    present in court with us, which I know was a factor.

25    Obviously she's sick and she can't be here, but I know that

*Proceedings*                                                        9

1   was a factor.

2           THE COURT:  She's a human being like the rest of us.

3           MR. RODDIN:  I think when we look at the package

4   that's being offered, other than the addition of one more

5   suretor and $50,000 more, it's almost identical to the package

6   that the Court --

7           THE COURT:  I think Giselle is doing more than that.

8   She is willing to, what is it, $250,000 she's willing to sign.

9           MS. NOTARI:  Yes, Your Honor.

10          And I do think that the Court should understand that

11  not only does she own -- she's the owner of two -- runs two

12  restaurants in New York City, but she's also chairperson of

13  the Economic Development and Culture Committee.  She's also

14  part of the community board.

15          She essentially -- and Mr. Johnson was somebody who

16  worked at her restaurant, and she's willing to allow him to

17  work on home confinement, on electric monitoring, at the

18  restaurant during the pendency of this case.  She is a pillar

19  of our community and --

20          THE COURT:  She makes a big difference to me.  Tell

21  me what she's willing to sign her name to.  250,000, if I

22  recall.

23          MS. NOTARI:  Yes, secured by the signatures.  We're

24  proffering four signatures.

25          THE COURT:  Secured by what?

1          MS. NOTARI:  Just, Your Honor, nobody has real

2   property to post.

3          THE COURT:  She has no real property.

4          MS. NOTARI:  No.

5          THE COURT:  So it's basically her Jane Hancock on a

6   piece of paper that's obligated $250,000?

7          MS. NOTARI:  Yes.

8          THE COURT:  But she does have these businesses, even

9   though she doesn't have any real estate that she owns.  Is

10  that correct?

11         MS. NOTARI:  Yes, Your Honor.

12         And, actually, as part of the package, and I

13  provided the government with this information in advance,

14  there's like --

15         THE COURT:  I'm willing to do this but I'd like to

16  speak to her.

17         MS. NOTARI:  Could we call her?  She's available.

18         THE COURT:  We can do that.  She's going to still

19  have to come in and sign.

20         MS. NOTARI:  That's fine but we can call her.  She's

21  ready.

22         MR. RODDIN:  One other point, Judge, if we're

23  talking about home confinement, I just want to be precise

24  about that wording.

25         If we're talking about home confinement, also known

1   as home incarceration, the defendant is not going to be able

2   to leave for work.  And it's certainly the government's

3   position --

4          THE COURT:  Let's talk about that.  Should we let

5   him work at the restaurant?

6          MR. RODDIN:  Your Honor, the other defendants who

7   have -- some of the other defendants who have been released

8   were released to home confinement, in other words, 24-hour

9   lockdown.

10         THE COURT:  My thinking is that I'm not going to let

11  him out of the house.  I mean we're going to move this trial

12  along.  That's the best way of dealing with it.  You're going

13  to tell me what the status is.

14         Where are we at in the negotiations for a global

15  plea, or are we going to trial here?  That may be factor that

16  will weigh on how I manage this.

17         MR. RODDIN:  There have not been extensive plea

18  negotiations.  What I can tell you is that we have been in

19  extensive discussions over a proposed protective order.

20         THE COURT:  You have been?

21         MR. RODDIN:  Yes.  As recently as less than an hour

22  ago we were on the phone with the defense attorneys discussing

23  the possible terms of the protective order.

24         That's been a longer process than we anticipated, to

25  be sure, but it's been a substantive process and we're getting

1  there.

2         THE COURT:  Well, I think I'm going to start off by

3  keeping him confined at home and see how it works.  And I can

4  always modify the conditions in the future, depending upon the

5  circumstances of when the trial would take place or not take

6  place, whether there will be a plea or not a plea.

7         I think I have to sort of like stage this in.  In

8  the first instance, if he prefers to sit at home rather than

9  jail I'll allow him to do that.

10         He understands that he at least has gotten credit

11  should he be convicted to have the time in jail credited

12  towards his ultimate release.  He's not going to get that in

13  home confinement.  So he should understand that.

14         MS. NOTARI:  Yes, he does.

15         THE COURT:  Why don't we do this.  Let me speak to

16  the suretors now and call up his brother first.  They each are

17  obligating themselves to how much, 200,000?  You say here, Ms.

18  Notari, to make sure I know what the facts are.

19         MS. NOTARI:  You want to speak to Stanley first?

20         THE COURT:  You stay right here and call up Stanley

21  first and the other people here.

22         THE COURTROOM DEPUTY:  If you could state your name,

23  for the record.

24         MR. S. JOHNSON:  Stanley M. Johnson, II.

25         THE COURT:  All right.  I assume you're going to be

1    telling me the truth now.

2              MR. S. JOHNSON:  Yes.

3              THE COURT:  You know your brother pretty well.  He's

4    had some problems, and I don't know whether you have had any

5    problems.  You can tell me.

6              Do you have a clean record?  Have you been in jail?

7              MR. S. JOHNSON:  I've been incarcerated.

8              THE COURT:  What for?

9              MR. S. JOHNSON:  Distribution of a controlled

10   substance.

11             THE COURT:  Drugs?

12             MR. S. JOHNSON:  Yes.

13             THE COURT:  What kind?

14             MR. S. JOHNSON:  Cocaine.

15             THE COURT:  How long ago?

16             MR. S. JOHNSON:  About 20 years ago.

17             THE COURT:  How much time did you serve?

18             MR. S. JOHNSON:  All told about 6, 7 years.

19             THE COURT:  So you've been at liberty for the last

20   14 years or so?

21             MR. S. JOHNSON:  Yes.

22             THE COURT:  What have you been doing?

23             MR. S. JOHNSON:  I work for the New York City

24   Housing Authority as a supervisor.

25             THE COURT:  How long have you worked for them?

*Proceedings*                                                        14

1          MR. S. JOHNSON:  Six and a half, going on seven

2    years.

3          THE COURT:  That is a responsible job.  And you've

4    been clean and you've been law abiding during this period of

5    time?

6          MR. S. JOHNSON:  Yes.

7          THE COURT:  Are you married?

8          MR. S. JOHNSON:  No.

9          THE COURT:  You don't have to be.  You have a

10   girlfriend?

11         MR. S. JOHNSON:  Yes.

12         THE COURT:  She's in court.  Where do you live?

13         MR. S. JOHNSON:  Between his -- with my brother Kyle

14   and her house in Brooklyn.

15         THE COURT:  Whose home?

16         MR. S. JOHNSON:  My girlfriend.

17         THE COURT:  Her home?

18         MR. S. JOHNSON:  Yes.

19         THE COURT:  Sounds like a good girlfriend to have.

20         Now, what is it that he's willing to sign for?  How

21   much?

22         MS. NOTARI:  Well, I have proposed $250,000.

23         THE COURT:  250,000.  What is your weekly salary?

24         MR. S. JOHNSON:  After child support?

25         THE COURT:  Before.

1          MR. S. JOHNSON:  Last year I made 75,000, including
2    overtime.
3          THE COURT:  You're going to be signing a document
4    that is going to say that if your brother doesn't comply with
5    his terms of release you're going to be on the hook for
6    250,000.
7          MR. S. JOHNSON:  Okay.
8          THE COURT:  Are you willing to do that?
9          MR. S. JOHNSON:  Yes.
10         THE COURT:  You may not have $250,000.
11         MR. S. JOHNSON:  I don't.
12         THE COURT:  I'm not criticizing.  If he does
13   dishonor you, you're going to have a judgment against you for
14   $250,000 that could be collected for the rest of your life.
15   Are you willing to do that for your brother?
16         MR. S. JOHNSON:  Yes.
17         THE COURT:  Mr. Johnson, you realize what your
18   brother is willing to do for you?
19         THE DEFENDANT:  Yes, Your Honor.
20         THE COURT:  Do you want to ask any questions of Mr.
21   Johnson?  I'll give you the opportunity to do that.
22         MR. RODDIN:  I have no additional questions.
23         THE COURT:  So, Ms. Lopez, you'll take care that he
24   signs the papers.  He can do it while he's here so he can take
25   care of this now.  Make sure he behaves.

*Proceedings*                                                      16

1              MR. S. JOHNSON:  Thank you, sir.

2              THE COURT:  Let's have your girlfriend.  She's the

3       other one.

4              MS. NOTARI:  No.  Kenya Tucker is my client's former

5       girlfriend but now they're friends.  They live separately.

6              THE COURT:  She's good friends of your client?

7              MS. NOTARI:  She's known him for approximately ten

8       years and she --

9              THE COURT:  I'm going to talk to her.

10             THE COURTROOM DEPUTY:  State and spell your name.

11             MS. TUCKER:  Kenya Tucker, K-e-n-y-a  T-u-c-k-e-r.

12             THE COURT:  Welcome to Court.  Have you ever been

13      before a judge before?

14             MS. TUCKER:  Once.

15             THE COURT:  I'm not going to ask what that's about.

16             You heard what I just questioned Mr. Johnson about.

17      So you understand what my concerns are.  I want to make sure

18      he has responsible suretors.

19             He doesn't have a lot of money.  I don't want him to

20      be penalized because of that.  I want to make a record and my

21      best efforts to make sure that he's going to behave himself.

22      Do you understand that?

23             MS. TUCKER:  Yes, sir.

24             THE COURT:  How much is it that you're proposing,

25      250,000?

1        MS. NOTARI:  Yes, Your Honor.

2        THE COURT:  Tell me a little bit about what you do

3   now.

4        MS. TUCKER:  I work in the restaurant business.  I

5   manage a restaurant in Riverdale in the Bronx, a couple days

6   of the week.  On the other days I'm building my business.  I

7   work as a bartender in private event spaces.  So if you,

8   yourself, or someone you know needs a bartender, bat mitzvah,

9   birthdays, you name it, give me a call.

10        THE COURT:  Sounds like you're probably a good

11   bartender.

12        MS. TUCKER:  I am.

13        THE COURT:  How long have you know Mr. Johnson?

14        MS. TUCKER:  Ten years.

15        THE COURT:  What's your current relationship?

16        MS. TUCKER:  He is one of my best friends.

17        THE COURT:  Do you have any -- have you had any

18   brushes with the law in the past?  I don't want to impose upon

19   you, but I want to make sure I have responsible suretors.

20        MS. TUCKER:  Yes.  I have no criminal record at all.

21        THE COURT:  Clean machine.

22        MS. TUCKER:  Correct.  Not even in a parking ticket.

23        THE COURT:  Mr. Roddin, do you want to ask any

24   questions at all?

25        MR. RODDIN:  I think we discussed at the last

1    appearance, but there was an order of protection issued on

2    behalf of Ms. Tucker against Mr. Johnson in 2020 that I think

3    the Court should inquire.

4              THE COURT:  It goes back to 2020?

5              MR. RODDIN:  That's correct.

6              THE COURT:  Tell me about what that's about.

7              MS. TUCKER:  Kyle and I lived together for five

8    years.  We were romantically involved from the beginning and

9    we broke up.  That was what that was about.

10             THE COURT:  This goes back a few years.

11             MS. TUCKER:  Four years ago.

12             THE COURT:  Have you sort of resolved your

13   differences?  Perhaps you're in a different place today.

14             MS. TUCKER:  Yes, we're friends.  Before we were

15   romantic and it wasn't working out.  Now we're friends.

16             THE COURT:  Anything else?

17             MR. RODDIN:  No, Your Honor.

18             THE COURT:  So you know you're going to be signing

19   today an obligation that obligates you for $250,000.  I

20   suspect you don't have that in the bank.

21             MS. TUCKER:  Not yet.

22             THE COURT:  You hope to?

23             MS. TUCKER:  Yes.

24             THE COURT:  If, in fact, Mr. Johnson, you had

25   problems in the past, decides not to abide by his terms of

1   release, you're going to be on the hook for $250,000.  That

2   will be a judgment that can be collected against you for the

3   rest of your life.  You understand that?

4            MS. TUCKER:  Yes, sir.

5            THE COURT:  So you're putting a lot of faith in him,

6   even though you've had this unfortunate situation in the past

7   that, nonetheless, you're willing to put your neck on the line

8   for him today, so to speak.

9            MS. TUCKER:  Yes, sir.

10            THE COURT:  Any questions you want to ask me?

11            MS. TUCKER:  How soon does he get out?

12            THE COURT:  He's going to get out as soon as we get

13   Ms. Giselle to sign some papers.  She's ill today.  I'm going

14   to keep him at home for a while.  You can visit.  But no

15   arguments, no fights, but it would be good for him to have

16   some support.  There's no question about that.  Whether I'll

17   let him out to go to work, that depends.  I'm not going to do

18   that in the first instance.  We'll see how he behaves himself.

19            MS. TUCKER:  Thank you.

20            THE COURT:  Who else is here?

21            THE COURTROOM DEPUTY:  We're going to call Giselle

22   now.

23            MS. NOTARI:  His other brother lives in Virginia,

24   and he was recently in a car accident so he's recovering.

25            THE COURT:  His other brother lives in Virginia.

*Proceedings*                                                    20

1    He's willing to also be a suretor for $250,000?

2              MS. NOTARI:  Yes.

3              THE COURT:  But he's not here.

4              MS. NOTARI:  He's also available by phone, Your

5    Honor.  He's recovering from a car accident.

6              THE COURT:  I can speak to him but --

7              MS. NOTARI:  Your Honor, usually the procedure is he

8    could either deal with the clerk's office here or he can go to

9    a clerk's office --

10             THE COURT:  I'm going to let Ms. Lopez secure

11   whatever documents you need from him, as quickly as you can.

12             PRETRIAL OFFICER LOPEZ:  My understanding is that's

13   correct, either he has to report to the district where he

14   resides or he has to report here to sign the documents.

15             THE COURT:  He doesn't have to sign anything?

16             PRETRIAL OFFICER LOPEZ:  He has to sign the bond.

17             THE COURT:  So you make sure that gets done, right?

18             PRETRIAL OFFICER LOPEZ:  Yes, Your Honor.

19             THE COURT:  He's going to be in for a while, for

20   another day or so, I suspect.  Get Ms. Giselle on the phone.

21             THE COURTROOM DEPUTY:  Ms. Malave, this is Judge

22   Block and he'd like to speak to you.

23             THE COURT:  Ms. Malave, is that how you pronounce

24   your last name?

25             MS. MALAVE:  Correct.

*Proceedings*                                                      21

1          THE COURT:  This is Judge Block speaking from the
2    courthouse.  Can you hear me?
3          MS. MALAVE:  I can hear you.
4          THE COURT:  I understand that you are,
5    unfortunately, ill today.  You have a high fever and you're
6    trying to recover.  I assume that's correct.
7          MS. MALAVE:  Yes, that is correct.
8          THE COURT:  I know that you're supportive from the
9    papers that you submitted for Mr. Johnson, and I want to talk
10   to you a little bit on the phone now so I have a comfort level
11   that he's going to behave himself properly should I let him
12   out of jail today, or perhaps tomorrow, as soon as we can get
13   around to handling the details.
14         Tell me a little bit about your business.  I know
15   Ms. Notari has spoken well of you.  But apparently you're
16   willing to sign a $250,000 personal bond.
17         Am I correct about that?
18         MS. MALAVE:  Correct.
19         THE COURT:  Do you understand that once you do that,
20   that if Mr. Johnson violates any of his conditions of release,
21   which are pretty extensive; he won't be able to leave the
22   house, at least initially, and he's going to be monitored and
23   he's going to have to behave himself, that if he violates any
24   of his conditions and he has to be remanded, that you will be
25   personally responsible for a quarter of a million dollars.

1           Do you understand that?

2           MS. MALAVE:  I do understand that.

3           THE COURT:  So you're putting a lot of faith and

4    confidence in him, which is admirable, but you have to

5    understand the consequences if he misbehaves.

6           Basically, once you sign on the dotted line, you're

7    going to be responsible for a quarter of a million dollars

8    should he be remanded, that the government can collect from

9    you for the rest of your life.

10          Do you understand that?

11          MS. MALAVE:  I understand that, Judge.

12          THE COURT:  Apparently you have a couple viable

13   restaurant businesses, but do not own any real property; is

14   that correct?

15          MS. MALAVE:  Correct.

16          THE COURT:  Tell me a little bit about your

17   restaurant businesses.  I assume that they are, hopefully,

18   successful and that you are making a decent income from them.

19   Tell me a little bit more.

20          MS. MALAVE:  My first restaurant I opened in 2017

21   and we've been there ever since.  We have received great

22   support from the community.  They enjoy our establishment, our

23   food, our drinks, our hospitality.

24          I sign my next lease for that establishment next

25   year for another ten years, God willing.

*Proceedings*                                                23

1          THE COURT:  Where is the restaurant located?

2          MS. MALAVE:  We are at 2252 First Avenue in East

3    Harlem, New York.

4          THE COURT:  Where?  I'm having a hard time hearing

5    you.

6          MS. NOTARI:  East Harlem.

7          THE COURT:  And there's another restaurant, as well?

8          MS. MALAVE:  Yes.  The second restaurant I opened

9    recently in the Bronx on 155th and Walton Avenue.  I'm

10   familiar with the area and the previous owner practically

11   knows me since I was a baby.  She got tired and needed help,

12   so she sold me the restaurant.  It's an operating restaurant

13   and we're doing very well, thank God.

14         THE COURT:  You do good business in both

15   restaurants?

16         MS. MALAVE:  Yes, thank God.

17         THE COURT:  Would there be room for me to eat there

18   if I were to come and visit?

19         MS. MALAVE:  Absolutely.

20         THE COURT:  No question about it.  I'm satisfied

21   from the papers you submitted to me that you will be committed

22   to supporting Mr. Johnson.  He's done bad things in the past,

23   but it doesn't mean he has to be in jail for the rest of his

24   life, necessarily.

25         I don't know whether I'm going to let him come work

1   for you, but if I were to do that, would he able to work in

2   your restaurant, in one or both of them?

3             MS. MALAVE:  Yes.

4             THE COURT:  What will you have him do?  I'm not

5   going to let him out now, but I'll think about it.  What would

6   you have him do?

7             MS. MALAVE:  I would have him open up the restaurant

8   in the morning, at least the one in the Bronx location because

9   we do open up very early.  We do breakfast, lunch, and an

10  early dinner.  So I would have him open in the Bronx and

11  supervise what it is, the prepping, the preparation, making

12  sure everything is always running at 100 percent.

13            THE COURT:  Initially I'm not going to let him do

14  that.  I'm open-minded to see how he behaves and we can

15  revisit that at a later time.

16            We want to try to get these charges resolved as

17  quickly as we can.  But he should be allowed to be at liberty.

18  He's presumed to be innocent now, and I'm going to let him be

19  at liberty.  But you do understand the responsibilities that

20  you have and the economic obligations you have should he be

21  remanded.  I just want to make sure I understand you clearly.

22  Yes to that?

23            MS. MALAVE:  Yes, I understand, Judge.

24            THE COURT:  Now, the government attorney is here,

25  Mr. Roddin.  I'll give him the opportunity to ask you any

*Proceedings*                                                          25

1    questions, which he may have.  Mr. Roddin?

2            MR. RODDIN:  Your Honor, I would just ask for Ms.

3    Malave to tell us what her relationship to Ms. Johnson is.

4            THE COURT:  Mr. Roddin wants to know what the nature

5    of your relationship is with Mr. Johnson, how long you've

6    known him and a little bit of a sense of all of that.

7            MS. MALAVE:  So when I opened up my first restaurant

8    in East Harlem he was a patron who didn't frequently go there

9    but he did go from time to time and just always so helpful and

10   things that really you don't expect from customers.

11           But he really did extend his help in the running of

12   my first restaurant with my husband and two children.  It was

13   very much appreciated.

14           THE COURT:  How long ago was that?

15           MS. MALAVE:  2017.  I would say about eight years.

16           THE COURT:  So for eight years he's been helping you

17   out, right?

18           MS. MALAVE:  Correct.

19           THE COURT:  Anything else?

20           MR. RODDIN:  No.  Thank you.

21           THE COURT:  Now, Ms. Malave, you have to, I believe,

22   sign papers here.  Ms. Lopez, you're going to tend to what has

23   to be done here with respect to all that?

24           PRETRIAL OFFICER LOPEZ:  Correct, Your Honor.

25           THE COURT:  I'm going to keep him here until

1   Ms. Lopez takes care of all the necessary paperwork, and he

2   will be released and I hope you're going to be covered.  You

3   don't have Covid, do you?

4               MS. MALAVE:  No, I tested negative today.  I think

5   it's a really bad flu.

6               THE COURT:  Get well fast and see you in court

7   someday, hopefully.  Anything else you wish to ask her, Ms.

8   Notari?

9               MS. NOTARI:  No, Your Honor.

10              THE COURT:  Thank you very much, Ms. Malave.  Get

11  better.

12              MS. MALAVE:  Thank you.

13              THE COURT:  So I don't normally do this, usually

14  magistrate judges take care of it all.  So is there anything

15  else I need to do?

16              PRETRIAL OFFICER LOPEZ:  You're asking me, Your

17  Honor?

18              THE COURT:  Yes.

19              PRETRIAL OFFICER LOPEZ:  No, there's nothing else.

20  I'll coordinate --

21              THE COURT:  Coordinate things with Ms. Notari.  And

22  she's not well, but maybe you can still get her to sign

23  something or do something over the telephone, whatever it is

24  that's required.  But you do whatever you need to satisfy

25  yourself and then let Mr. Innelli know that you are satisfied

1   that everything was done appropriately, that all the papers

2   have been signed, and at that time we'll let him go.

3           PRETRIAL OFFICER LOPEZ:  I want to clarify, for the

4   record, the bond, that everyone is on board?  I just want to

5   note the conditions on the record.

6           THE COURT:  He should know his conditions.

7           PRETRIAL OFFICER LOPEZ:  He's going to report to

8   pretrial services as directed, surrender any passport, and do

9   not reapply for any documents.

10          THE COURT:  Go slow because we have to get this down

11  on the record.

12          PRETRIAL OFFICER LOPEZ:  Travel within New York

13  City, Long Island, and Southern District of New York, have no

14  contact with codefendants, victims, and witnesses, subject to

15  home incarceration, which is 24-hour lockdown at the residence

16  except for medical necessities, court appearances and any

17  other activity ordered by the Court, and no contact with

18  anyone in organized crime.

19          THE COURT:  Mr. Johnson, do you understand all that?

20          THE DEFENDANT:  I do, Your Honor.

21          THE COURT:  Be very careful because you have

22  associated with people who are having problems with the law,

23  so be very, very careful.  You seem like you have a serious

24  way about you.  I think it's unfortunate you have a checkered

25  past, but it's never too late to turn a corner and hopefully

1    you'll be able to do that.

2            You have a serious charges against you here.  But

3    still, you're entitled to your freedom pending trial, the

4    disposition of your case.  Is there anything you want to ask

5    me?

6            THE DEFENDANT:  No, Your Honor.  I appreciate it.

7    Thank you.

8            THE COURT:  You understand everything that we spoke

9    about in court?

10            THE DEFENDANT:  I do.

11            THE COURT:  You understand your good friends are

12    going to be on the hook for a lot of money should you not

13    behave?

14            THE DEFENDANT:  I do, Your Honor, and I appreciate

15    it.

16            THE COURT:  Well, you should thank them for that and

17    make sure they're not going to have any problems.

18            THE DEFENDANT:  Absolutely.

19            THE COURT:  So I'm not sure if there's anything else

20    I need to do, Ms. Notari.  I don't usually do these things.

21    Usually the magistrate judge does it, but I think we've

22    covered everything.

23            Is there anything you want to add?

24            MS. NOTARI:  No, Your Honor.

25            THE COURT:  Yes, Mike.

*Proceedings*                                                  29

1          THE COURTROOM DEPUTY:  I have a telephone number for

2    Joseph Johnson, if you would like to speak to him.

3          THE COURT:  I don't think it's necessary.  If you

4    can get him also, do that, but I'm not going to hold him up

5    because of that.

6          Mr. Roddin, anything else?

7          MR. RODDIN:  No.  Thank you.

8          THE COURT:  I thank you for being in court.  I want

9    you to understand, I take these things very seriously,

10   notwithstanding sometimes it's good to smile once in awhile in

11   our troubled world.  We all share those thoughts, I'm sure.  I

12   think this concludes the proceeding.  Good luck, Mr. Johnson.

13              (Proceedings concluded at 3:42 p.m.)

14         -  -  -  -  -  -  -  -  -  -  -  -  -  -  -  -

15

16         I certify that the foregoing is a correct transcript

17   from the record of proceedings in the above-entitled matter.

18

19   */S/ Nicole Sesta, RMR, CRR*
     *Court Reporter/Transcriber*

20

21   *February 24, 2024*
          *Date*

22

23

24

25