SMS:AMR/EL/BET
F. #2020R00939

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

   - against -                                                                      No. 23-CR-443 (FB)

ROBERT BROOKE,

                             Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

THE GOVERNMENT'S MOTIONS IN LIMINE TO ADMIT CERTAIN EVIDENCE
AND PRECLUDE CERTAIN EVIDENCE AND ARGUMENT AT TRIAL

JOSEPH NOCELLA, JR.
United States Attorney
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

Andrew M. Roddin
Elias Laris
Brooke Theodora
Assistant U.S. Attorneys
    (Of Counsel)

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 3

RELEVANT BACKGROUND ................................................................................................... 3

ARGUMENT .................................................................................................................................. 8

    I.     Evidence of the Defendant's Co-Conspirator's Reputation is Admissible......................... 8

    II.    Evidence or Argument of a "Claim of Right" Defense Should Be Precluded.................. 11

    III.   Certain Business Records Are Admissible ........................................................................ 13

    IV.   Improper Use of Agent Reports to Impeach Witnesses Should Be Precluded ................. 15

    V.    Evidence or Argument Concerning Possible Punishment and Collateral Consequences Should Be Precluded .......................................................................................................... 17

CONCLUSION ............................................................................................................................. 19

## PRELIMINARY STATEMENT

The government respectfully moves in limine to:

(1) admit evidence concerning the reputation of the defendant Robert Brooke's co-conspirator Diego Tantillo ("Tantillo");

(2) preclude evidence and argument that attempts to assert a "claim of right" defense to the defendant's Hobbs Act extortion charge;

(3) admit certain business records;

(4) preclude improper use of law enforcement reports to impeach witnesses; and

(5) preclude evidence or argument concerning possible punishment.

For the reasons set forth herein, the government's motions in limine should be granted.

## RELEVANT BACKGROUND[1]

On November 2, 2023, a grand jury sitting in this District returned an indictment (the "Indictment") charging the defendant with (1) conspiracy to commit Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a), and (2) Hobbs Act extortion, in violation of 18 U.S.C. § 1951(a). The defendant's trial is set to begin on November 10, 2025.[2]

---

[1] The proffer of facts set forth herein does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce at trial. In addition, the proffer of facts set forth in this motion as to any witness's anticipated testimony reflects the sum and substance of the witness's anticipated testimony and does not purport to provide a complete statement of all facts and evidence of which the government is aware or will seek to introduce through that witness.

[2] As the Court is aware, the Indictment also charges nine other defendants with crimes including racketeering conspiracy, in violation of 18 U.S.C. § 1962(d), Hobbs Act extortion and conspiracy, in violation of 18 U.S.C. § 1951(a), and theft and embezzlement from employee benefit plans, in violation of 18 U.S.C. § 664, among other crimes. On October 17, 2025, seven of these defendants (Joseph Lanni, Diego Tantillo, Angelo Gradilone, Kyle Johnson, Vincent Minsquero, Vito Rappa, and Francesco Vicari) pleaded guilty before this Court. Defendant Salvatore DiLorenzo pleaded guilty on August 5, 2025. The remaining defendant, James LaForte, does not yet have a trial date scheduled. See ECF No. 316.

3

The charges against the defendant stem from his violent extortion of three individuals ("John Does 2–4"), owners of a demolition company ("Demolition Company 1"), from at least November 2019 to January 2020. During that time, the defendant conspired with Tantillo—a soldier in the Gambino crime family—to extort thousands of dollars from John Does 2–4, purportedly to satisfy a disputed, nearly three-year-old debt owed to the defendant and Tantillo's company, Specialized Concrete Cutting Corp. ("Specialized"). This extortion culminated in the defendant's brutal attack of John Doe 2 in December 2019, while he was walking to work in midtown Manhattan. The defendant approached John Doe 2 on the sidewalk and repeatedly struck him in the face, leaving him bloodied with a black eye and fractured eye socket. A few weeks later, John Does 2–4—afraid for their safety given the defendant's demonstrated violence and Tantillo's membership in a violent organized crime group—paid the defendant and Tantillo's company $40,000.

I.  The Defendant and Tantillo's Relationship with John Does 2–4 and Demolition Company 1

At trial, the government intends to offer the following evidence of the defendant's scheme with Tantillo to extort John Does 2–4. Around 2005, Tantillo and Tantillo's brother obtained an ownership interest in Demolition Company 1, joining John Does 2–4 as the company's owners. John Does 2–4 generally served as executives and were responsible for business, financial, and field operations, while Tantillo acted as a "general foreman," primarily for Demolition Company 1's exterior demolition projects. As general foreman, Tantillo managed on-site project staffing, work plans, and labor and equipment allocation for demolition projects, among other responsibilities. With respect to staffing and equipment allocation, Tantillo frequently pressed John Does 2–4 to have Demolition Company 1 subcontract portions of work to the defendant and his company Specialized, which rented specialized demolition equipment. John

4

Does 2–4 suspected that Tantillo might also have an ownership interest in Specialized, even though Tantillo denied any involvement in the company.[3]

Beginning in approximately 2016, the relationship between John Does 2–4 and Tantillo began to sour. John Does 2–4 noticed that Tantillo was increasingly associating with people in organized crime, and they also began to suspect that Tantillo was stealing from Demolition Company 1, including by using its construction projects as vehicles to make inflated payments to other companies associated with Tantillo, such as Specialized. Among several other irregularities, John Doe 3—who managed Demolition Company 1's financial operations—found it unusual that, on certain projects, Tantillo had arranged for Demolition Company 1 to both subcontract with the defendant's business and pay the defendant hourly through Demolition Company 1's payroll.

In 2017, Demolition Company 1 subcontracted with Specialized on an exterior demolition job at 787 11th Avenue (the "11th Avenue Job"). On the 11th Avenue Job, Demolition Company 1 lost a significant amount of money and was forced to deduct payments from its contractors, including Specialized. Nevertheless, the defendant alleged that Demolition Company 1 owed Specialized over $100,000 for equipment rentals, which John Doe 3 believed was significantly inflated irrespective of any loss that Demolition Company 1 suffered. John Doe 3 asked Tantillo to provide additional details to justify the over $100,000 payment to Specialized; instead of providing additional details, Tantillo said he would speak to the defendant about the invoice. Subsequently, the defendant stopped requesting payment for the 11th Avenue Job.

---

[3] According to tax returns and other documents seized from Tantillo's cell phone pursuant to a judicially-authorized search warrant, in 2019, Tantillo's wife owned approximately 80 percent of Specialized, with the defendant's wife owning the remaining 20 percent.

II.   The Defendant and Tantillo's Extortion of John Does 2–4

In late 2018 or early 2019, John Does 2–4 learned that Tantillo was a "made man" in the Gambino crime family and decided that they needed to finally terminate his involvement with Demolition Company 1. John Does 2–4 met Tantillo at the Tick Tock diner in New Jersey, where they confronted him with their belief that he was involved in organized crime, told him that he could not remain a partner in Demolition Company 1 as a result of this association, and instructed him that they were therefore going to buy him out of his ownership interest in Demolition Company 1. In the ensuing months, John Does 2–4, Tantillo, and their lawyers began negotiating the price of Tantillo's buyout, which stalled due to their disagreement over the value of Tantillo's shares. During negotiations, Tantillo repeatedly called and texted John Does 2–4 about finalizing the buyout, at times using aggressive language.

After the meeting at the Tick Tock diner, John Does 2–4 also fired Tantillo as general foreman, cutting off his ability to use Demolition Company 1 as a conduit for payments to companies with which he was affiliated. In the months that followed—and while Tantillo was pressuring Demolition Company 1 for a buyout payment—the defendant also renewed his efforts to extract money from Demolition Company 1. In approximately November 2019, the defendant demanded that Demolition Company 1 pay Specialized—a company in which Tantillo held an 80 percent ownership interest—more than $100,000 on the inflated invoice that Tantillo had supervised on the 11th Avenue Job. Around that time, the defendant confronted John Doe 2 in a midtown Manhattan parking lot where they both parked during the workweek about the purported debt, and the two had an argument over it.

A few weeks later, on December 18, 2019, the defendant again confronted John Doe 2 near the same parking lot—this time approaching him from behind and striking him

6

repeatedly in the head. During the attack, the defendant shouted at John Doe 2 and said, among other things and in sum and substance, that he did not care if he went to jail for assaulting him. The assault prompted at least two witnesses to call 911, and the New York City Police Department ("NYPD") responded to the scene. Bloodied and bruised, John Doe 2 was placed in an ambulance and taken to the hospital, where he was treated for injuries including a concussion and a bone fracture near his cheek. When questioned by the NYPD, John Doe 2 identified the defendant by name as his assailant.

According to cell site data, about an hour after the defendant's attack of John Doe 2, the defendant met Tantillo a few blocks from where the assault occurred and remained with him for approximately 20 minutes. A few weeks later, Tantillo called John Doe 3 and said, in sum and substance, that Demolition Company 1 needed to pay the defendant the money he was owed, including for the purported debt on the 11th Avenue Job. Tantillo also separately reached out to John Doe 2 and asked him to drop the charges against the defendant. Tantillo's demands, coupled with the defendant's recent assault of John Doe 2, were the tipping point that made John Does 2–4 acutely aware—and fearful—of the dangers posed by Tantillo's reputation. Afraid for their safety, John Does 2–4 acquiesced to paying Specialized a total of $40,000 on January 6, 2020.[4] They also rushed to finalize Tantillo's buyout payment, which they quickly resolved in March 2020 (after more than a year of stalled negotiations). And in February 2020, in line with Tantillo's request, John Doe 2 told the NYPD he no longer wished to pursue charges against the defendant.

---

[4] Demolition Company 1 paid Specialized in two checks: a $9,428.59 check for the 11th Avenue Job, and a $30,571.41 check for another more recent job at 400 West 61st Street (the "West End Job").

7

ARGUMENT

I.    Evidence of the Defendant's Co-Conspirator's Reputation Is Admissible

At trial, the government intends to offer evidence that Tantillo—the defendant's co-conspirator—had a reputation for being a "made man" in the Gambino crime family. The Court should admit this evidence because it is directly relevant to whether John Does 2–4's payments to the defendant and Tantillo's company were compelled by the wrongful use or threat of force, violence, or fear—an element of Hobbs Act extortion—and on the separate basis that such evidence is inextricably intertwined with the crimes charged against the defendant.

In Hobbs Act extortion cases, it is well-established that evidence of a defendant's "organized crime reputation" is directly admissible to satisfy the "fear element" of Hobbs Act extortion. See, e.g., United States v. Fazio, 770 F.3d 160, 165 (2d Cir. 2014) ("The admissibility of the organized crime reputation evidence is a function of the nature of the government's required proof, which goes to the fear reasonably experienced by the victims, an element of extortion."); United States v. Tropiano, 418 F.2d 1069, 1081 (2d Cir. 1969) (same). The Second Circuit has held that such reputation evidence is admissible to prove, on the one hand, a victim's state of mind—i.e., to demonstrate that the victim acted out of reasonable fear when surrendering his or her property. See, e.g., Fazio, 770 F.3d at 165. Likewise, the Second Circuit has also held that such evidence is admissible to prove the defendant's state of mind—i.e., to demonstrate that the defendant knowingly exploited his own reputation to stoke the victim's fear. See, e.g., United States v. Mulder, 273 F.3d 91, 103 (2d Cir. 2001) ("[b]ad reputation is relevant to the fear element in a Hobbs Act conspiracy since such a reputation frequently conveys a tacit threat of violence" (internal quotation marks omitted)); United States v. Abelis, 146 F.3d 73, 83 (2d Cir. 1998) (same). In either case, so long as such evidence is offered to prove actions taken in furtherance of the charged conspiracy—as it is here—it is directly admissible against both the defendant whose

reputation is at issue and any co-conspirators.  See, e.g., United States v. Russo, 302 F.3d 37, 45 (2d Cir. 2002) ("Conspiracies to commit a crime or an unlawful or tortious act are analogous to partnerships.  If A and B are engaged in a conspiracy, the acts and declarations of B occurring while the conspiracy is actually in progress and in furtherance of the design are provable against A, because they are acts for which A is criminally or civilly responsible as a matter of substantive law." (quoting McCormick on Evidence § 259 (5th ed. 1999) (internal quotation marks omitted)).[5]

        Here, evidence of Tantillo's reputation as a member of the Gambino crime family is directly relevant for both purposes.  First, it demonstrates that John Does 2–4 were afraid—and that those fears were reasonable—when Tantillo told them to pay the defendant's company and to drop their charges in the aftermath of the defendant's assault of John Doe 2.  At this time, John Does 2–4 believed Tantillo was a newly-minted member of a violent organized crime family, and they were understandably afraid that if they did not acquiesce to his demands, they would be the victims of additional—and potentially worse—violence.  Second, it provides crucial context for how Tantillo intended his requests to John Does 2–4 about the defendant to be received.  Tantillo's knowledge that John Does 2–4 believed he was a "made man" when he made these requests shows

---

[5] Further, to the extent the government offers out-of-court statements to prove Tantillo's reputation as a member of the Gambino crime family, such evidence is also admissible under the hearsay exception for reputation evidence.  Reputation evidence by its very nature "must be based on hearsay."  United States v. Zhong, 26 F.4th 536, 554 (2d Cir. 2022).  Pursuant to Federal Rule of Evidence Rule 803, "testimony regarding a reputation among a person's associates or in the community concerning the person's character is not excluded by the rule against hearsay."  Id. at 554 (citing Fed. R. Evid. 803(21)).  "Generally speaking, when testifying about a defendant's reputation, a witness is allowed to summarize what he has heard in the community, so long as the testimony is relevant and the government establishes a foundation that the witness is acquainted with the defendant, the community in which he has lived, and the circles in which he has moved."  United States v. Romanello, No. 22-CR-194 (EK), 2023 WL 8435993, at *1 (E.D.N.Y. Dec. 4, 2023) (quoting Michelson v. United States, 335 U.S. 469, 477 (1948) (internal quotation marks omitted)).  Accordingly, the government's witnesses should be allowed to testify about any statements they have heard from others in their community about Tantillo's reputation.

that they were not innocuous suggestions or benign proposals—they were a "tacit threat of violence." Mulder, 273 F.3d at 103; cf. United States v. Dennis, 625 F.2d 782, 800 (8th Cir. 1980) ("If a man makes vaguely menacing statements, aware that he is commonly known as a violent man, then it is a reasonable inference that he intends to instill fear."). Given their confrontation at the Tick Tock diner, Tantillo knew that John Does 2–4 believed he was a member of an organized crime family when he told them to pay the defendant, and he knowingly exploited that reputation to get what he—and the defendant—wanted.

Evidence of Tantillo's reputation in organized crime is also directly admissible as inextricably intertwined with—and to complete the story of—the charged crimes against the defendant. It is well-settled that evidence of uncharged criminal activity is admissible as direct evidence of a charged crime "if it is inexorably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000); see also United States v. Towne, 870 F.2d 880, 886 (2d Cir. 1989) (same); 2 Weinstein's Federal Evidence § 404.12[3] at 404-34.2 to 404-34.3 (Joseph M. McLaughlin, ed., 2d ed. 2003). Further, evidence of uncharged criminal activity may be admitted as direct evidence where it provides "[b]ackground . . . to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." United States v. Ashburn, Docket No. 11-CR-303, 2015 WL 588704, at *10 (E.D.N.Y. Feb. 11, 2015) (quotation marks and citations omitted). Such evidence is directly admissible as relevant under Federal Rules of Evidence 401 and 402 because it "tend[s] to prove the government's case," and relevant evidence is "not confined to that which directly establishes an element of the crime." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).

With respect to the charges against the defendant, evidence of Tantillo's status and

10

reputation as a member of the Gambino crime family is essential to understanding both the motive and means of the charged extortion conspiracy within which the defendant participated. Indeed, Tantillo's organized crime reputation was the catalyst for the defendant's and Tantillo's extortion scheme. Had John Does 2–4 failed to uncover that Tantillo was a "made man" in early 2019, they would not have fired him from Demolition Company 1—and the defendant would not have re-asserted his purported $100,000 claim as a way to funnel more of Demolition Company 1's money to himself and Tantillo. Accordingly, absent being presented evidence of Tantillo's reputation as an organized crime member, the jury will be unable to grasp the nature of the charged conspiracy and extent or the motives driving the defendant and Tantillo's conduct. The Court thus should admit evidence of Tantillo's reputation as a member of the Gambino crime family at the defendant's trial.[6]

## II.   Evidence or Argument of a "Claim of Right" Defense Should Be Precluded

The defendant has indicated that he intends to offer evidence at trial that purportedly shows he was lawfully owed the $40,000 that Demolition Company 1 paid

---

[6] Even if not admissible as direct evidence, evidence of uncharged criminal activity is also admissible under Federal Rule of Evidence 404(b) if it is offered to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," see Rule 404(b), and not for the improper purpose of proving the defendant's bad character or criminal propensity. See United States v. Mickens, 926 F.2d 1323, 1328 (2d Cir. 1991) (citing United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989)). As described above, the government intends to offer evidence of Tantillo's reputation in organized crime to show both that he acted with the motive/intent to exploit his reputation, and that John Does 2–4 paid the defendant with the intent assuage their fears of further violence. Accordingly, such evidence is properly admissible under Rule 404(b). Moreover, given that evidence of Tantillo's organized crime reputation is both central to understanding the charges against the defendant and to proving one of the core issues in this trial, as described above, the probative value of this evidence significantly outweighs any potential prejudice to the defendant. It thus is also properly admitted under Federal Rule of Evidence 403. See United States v. Lombardozzi, No. S1 02 CR. 273(PKL), 2003 WL 1907965, at *4 (S.D.N.Y. Apr. 17, 2003) (in an extortion case, evidence that a defendant was a "made member" of an organized crime family not unfairly prejudicial under Rule 403 because it was highly relevant to whether the defendant's conduct actually caused the victims to be afraid).

11

Specialized.  See ECF No. 256 at 12-14.  To the extent the defendant intends to use this evidence to assert a "claim of right" defense to extortion, the defendant should be precluded from doing so.

In the Second Circuit, there is no "claim of right" defense to Hobbs Act extortion, meaning that the defendant's allegedly honest belief in his legal right to any property he obtained has no bearing on whether he committed the crime of extortion.  As the Second Circuit explained in United States v. Zappola, 677 F.2d 264 (2d Cir. 1982), in enacting the Hobbs Act, "Congress meant to punish as extortion any effort to obtain property by inherently wrongful means, such as force or threats of force or criminal prosecution, regardless of the defendant's claim of right to the property."  Id. at 268 (emphasis added); see also United States v. Markle, 628 F.3d 58, 62 (2d Cir. 2010) (in Hobbs Act case, concluding that "the district court properly precluded [the defendant] from advancing [a claim of right] defense at trial and properly declined to instruct the jury on that defense").  This is because, fundamentally, the Hobbs Act "does not permit the use or threat of force or violence or fear induced thereby to collect debts."  Zappola, 677 F.2d at 268.

Here, any assertion by the defendant that he believed he was entitled to the $40,000 from Demolition Company 1 is nothing more than an improper attempt to assert a claim of right defense that is barred in the Second Circuit.  In light of the authorities described above, the defendant's purportedly honest belief that he was entitled to the money he received from John Does 2–4 is legally irrelevant to whether he committed Hobbs Act extortion.  Regardless of whether the defendant honestly believed he had a legal right to this property—and even assuming, arguendo, that he did have a legal right to the property—using violence (e.g., the assault of John Doe 2) to obtain it is still a violation of the Hobbs Act.  See id. at 268 ("[a] person whose property has been stolen cannot claim the right to punish the thief himself without process of law" (quoting State v. Bruce, 24 Me. 71 (1844)).  Accordingly, such evidence and argument would serve only to

distract the jury—and waste the Court's time—by shifting focus away from the core issue at this trial: whether the defendant wrongfully used force, violence, or fear to obtain property from John Does 2–4. It therefore should be precluded.

III.     Certain Business Records Are Admissible

At trial, the government intends to introduce certified business records, including subscriber and toll records of AT&T, T-Mobile, and Verizon. The government has previously provided the defense with the certifications; any additional certifications will be provided upon receipt from the relevant entity.

The Supreme Court has held that admitting business records that have been authenticated by affidavit or certificate does not violate a defendant's right to confrontation. See Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009). The Court has explained that "[b]usiness and public records are generally admissible absent confrontation . . . because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." Id. at 324.

Relying on Melendez-Diaz, the Second Circuit and at least five other circuits have concluded that certifications authenticating records are not testimonial and are permissible. See, e.g., United States v. Qualls, 613 F. App'x 25, 28 (2d Cir. 2015); United States v. Johnson, 688 F.3d 494, 504-05 (8th Cir. 2012); United States v. Yeley-Davis, 632 F.3d 673, 680-81 (10th Cir. 2011); United States v. Morgan, 505 F.3d 332, 339 (5th Cir. 2007); United States v. Ellis, 460 F.3d 920 (7th Cir. 2006); United States v. Weiland, 420 F.3d 1062, 1077 (9th Cir. 2005). As the Seventh Circuit explained in Ellis, such certifications are "nothing more than the custodian of records . . . attesting that the submitted documents are actually records kept in the ordinary course of business" and "merely establish the existence of the procedures necessary to create a business record." 460 F.3d at 927. It is the underlying records, not a certification, that are admitted to establish the facts.

13

Consistent with this understanding of the confrontation right, federal law permits the authentication of business records by certification and sets forth specific requirements for their admission. Federal Rule of Evidence 902(11) expressly permits the authentication of domestic business records by certification, and courts in the Second Circuit have routinely applied these provisions to admit certified business records at trial. See, e.g., United States v. Komasa, 767 F.3d 151 (2d Cir. 2014); Qualls, 613 F. App'x at 28 (affirming admission of foreign business records based upon a certification, absent a live witness to authenticate the documents). Further, Federal Rule of Evidence 902(13) permits the authentication of records generated by an electronic process or system. See United States v. Otufale, No. 24-CR-170 (KAM), 2024 WL 3391094, at *9 (E.D.N.Y. July 12, 2024) (finding that records generated by an electronic process or system "may constitutionally be admitted in a criminal trial absent live testimony from the custodian because such records are not 'testimonial.'" (quoting Melendez-Diaz, 557 U.S. at 311 n.1)).

Likewise, under Federal Rules of Evidence 902(1) and 902(2), domestic public documents are self-authenticating and "require no extrinsic evidence of authority in order to be admitted" so long as they bear either (1) a seal and signature, see Rule 902(1), or (2) "a signature of an officer or employee" of a "department, agency or officer" of "any state," see Rule 902(2).

The government should be permitted to authenticate and admit the relevant records of AT&T, T-Mobile, and Verizon because doing so is proper under the law. The government intends to offer these records at trial under Rules 803(6)(D), 902(1), 902(2), 902(11) and 902(13) pursuant to certifications that meet the requirements of Rule 803(6)(A)-(C). As noted, the government has provided the defense, and will continue to provide as they become available, the certifications and underlying records in discovery, and the defense is hereby informed of the government's intention to offer them as evidence at trial. Such a process would eliminate

unnecessary witnesses, shorten the amount of time that jurors will need to sit for trial, and ensure that witnesses who may reside outside New York need not travel to New York to appear at trial. Accordingly, the government seeks a pretrial ruling that these records may properly be authenticated as self-authenticating business and public records and respectfully requests that the Court admit the above referenced business records at trial pursuant to Rules 803(6)(D), 902(2), 902(11) and 902(13).

IV. <u>Improper Use of Law Enforcement Reports to Impeach Witnesses Should Be Precluded</u>

In accordance with its obligations under 18 U.S.C. § 3500, the government has produced to the defense summaries of witness interviews prepared by law enforcement agents. The government respectfully requests that the Court preclude the defense from introducing the contents of these reports to impeach such witnesses during cross-examination, publishing the contents of the reports to the jury, or otherwise suggesting to the jury that the reports are statements of the witnesses who did not write or adopt them.

A party may impeach a witness with a prior inconsistent statement of that witness, but the statement must be the witness's <u>own</u> statement that he or she either made or adopted. See Fed. R. Evid. 613; <u>United States v. Alamonte</u>, 956 F.2d 27, 29 (2d Cir. 1992) (concluding that the trial court did not err in refusing to admit prosecutor's notes taken during debriefing of witness and explaining that a "third party's characterization" of a witness's statement thus does not constitute a prior statement of that witness "unless the witness has subscribed to that characterization" or, in other words, endorsed it); <u>United States v. Leonardi</u>, 623 F.2d 746, 757 (2d Cir. 1980) (holding that because "the written statement of the FBI agent was not attributable to [the witness]," it was "properly rejected as a prior inconsistent statement"). As the Second Circuit has explained, the problem with using a third party's summary or characterization of the witness's statement to impeach is "one of relevancy": "If a third party's notes reflect only that

15

note-taker's summary characterization of a witness's prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible." Alamonte, 956 F.2d at 29.

Notably, the Jencks Act governs the discoverability of a witness's prior statements, and its definition of "statement" accords with Fed. R. Evid. 613(a) and applicable case law on proper impeachment using prior inconsistent statements. Under the Act, a statement means "a written statement made by said witness and signed or otherwise adopted or approved by him," a recording or transcription that "is substantially [a] verbatim recital of an oral statement made by said witness and recorded contemporaneously," or a statement made by a witness to the grand jury. See 18 U.S.C. § 3500(e). As the Supreme Court has explained, because the Jencks Act is meant to restrict the defendant's use of discoverable statements for impeachment, "only those statements which could properly be called the witness' own words should be made available to the defense for purposes of impeachment." Palermo v. United States, 360 U.S. 343, 349, 352 (1959). And the Court further noted that an "agent's interpretations and impressions" of a witness do not fall within the purview of the Act. Id. at 352-53.

In this case, as described above, the government has provided the defense with reports summarizing investigators' interviews with government witnesses. These reports were not reviewed or adopted by any of the government witnesses. Moreover, they were finished after interviews were completed and reflect the thought processes and interpretations of the agents and officers; they do not constitute verbatim recitals or transcripts of any of the witnesses' statements.[7] As a result, the statements in these reports are not statements of any of the government's witnesses

---

[7] These reports would, however, constitute prior statements of the agents or officers who prepared the report if they are called as a witness to testify regarding the subject matter contained in the report.

16

(other than the reports' authors, if called to testify at trial), cannot be used for impeachment, and should not be read aloud or shown to the jury.[8]  See Alamonte, 956 F.2d at 28; Leonardi, 623 F.2d at 757.  The Court should therefore preclude any use or suggestion by defense counsel that a statement in a law enforcement summary report is a statement of the witness being interviewed.

V.  Evidence or Argument Concerning Possible Punishment and Collateral Consequences Should Be Precluded

The government moves to preclude any discussion or argument concerning possible collateral consequences or punishment which may result from a conviction in this case.  Such argument or evidence is irrelevant and therefore inadmissible.  See Fed. R. Evid. 402 ("Irrelevant evidence is not admissible.").  Any reference during trial to possible punishment may only "prejudice, distract, or confuse the jury."  United States v. Jadusingh, No. 18-CR-257 (KAM), 2020 WL 207950, at *3 (E.D.N.Y. Jan. 14, 2020) (citing Shannon v. United States, 512 U.S. 573, 579 (1994)).  Accordingly, "[f]ederal courts usually instruct juries not to consider a verdict's consequences."  United States v. Blume, 967 F.2d 45, 49 (2d. Cir. 1992) (citing Rogers v. United States, 422 U.S. 35, 40 (1975)).

The Court should preclude the defendant and his counsel from referencing the possible punishment or consequences which will accompany a guilty verdict.  Although the defendant has not stated an intention to reference at trial the possible consequences of a conviction, the government moves to preclude any mention of sentence out of an abundance of caution.  Any reference to sentencing will serve to confuse the jury and undermine its role as the trier of fact.

---

[8]  The government acknowledges that the defense may ask a witness whether he or she made a statement that is reflected in a law enforcement report.  However, if the defense is not satisfied with the witness's answer, the defense may not publish or introduce the report's contents as a prior inconsistent statement.  Additionally, if appropriate and with proper foundation, the defense may attempt to refresh a witness's recollection by showing the witness the report, but only if the defense does so in a manner that does not imply that the report is the witness's own statement or publish its contents to the jury.

17

Discussion of the consequences of a conviction could invite the jury to consider nullification, a violation of the Court's instructions and an outcome the Court is duty bound to prevent. United States v. Thomas, 116 F.3d 606, 616 (2d Cir. 1997). Therefore, the Court should preclude the defendant from referencing potential punishment or collateral consequences at trial.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court grant the government's motions in limine.

Dated:    Brooklyn, New York
          October 17, 2025

                                      JOSEPH NOCELLA, JR.
                                      United States Attorney
                                      Eastern District of New York

By:     /s/
        Andrew M. Roddin
        Elias Laris
        Brooke Theodora
        Assistant U.S. Attorneys
        (718) 254-7000